## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

———————————————————————————— )
DINA SOLIMAN, M.D.                                  )
                                                    )
    Plaintiff,                              )
                                                    )
    v.                                      )          Civil Action No. 1:08-cv-01137 (RJL)
                                                    )
GEORGE WASHINGTON UNIVERSITY, *et al.*              )
                                                    )
    Defendants.                             )
———————————————————————————— )

### PLAINTIFFS' NOTICE OF FILING AMENDED COMPLAINT

Plaintiff Dina Soliman, M.D., by and through undersigned counsel, hereby files her Amended Complaint, attached hereto.  The only changes that are made in the Amended Complaint reflect:  (1) the substitution of the entity known as Universal Health Services of D.C., Inc., for Universal Health Services and Universal Health Services Foundation as a defendant in this matter; (2) the updated address for defendant Richard Becker, M.D.; and (3) additional factual allegations regarding defendants Becker, Universal Health Services of D.C., Inc., and the other institutional defendants.

Respectfully submitted,


_____/s/_____
Lynne Bernabei, Esq. (D.C. Bar # 938936)
Emily Read, Esq. (D.C. Bar # 492773)
Bernabei & Wachtel, PLLC
1775 T Street, N.W.
Washington, D.C. 20009
(202) 745-1942

Attorneys for Dr. Dina Soliman

DATED:  August 13, 2008

1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

DINA SOLIMAN, M.D.                                    )
  4811 Garden Spring                                )
  Apt. #208                                             )
  Glen Allen, VA 23059                              )
                                  )
        Plaintiff                                )
                                  )
v.                                                           )
                                  )
GEORGE WASHINGTON UNIVERSITY        )
  2300 Eye Street, N.W.                            )
  Washington DC 20037                             )
                                  )
Serve:  Mary Lynn Reed                              )
        2100 Pennsylvania, Ave., N.W., Suite 250  )
        Washington, DC 20052                    )
                                  )     Civil Action No.1:08-cv-01137 (RJL)
MEDICAL FACULTY ASSOCIATES, INC.      )
  2150 Pennsylvania Avenue, N.W., Suite 10-407  )
  Washington, DC   20037                         )
                                  )
Serve:  Corporation Service Company          )
        1090 Vermont Ave., N.W.                  )
        Washington, DC 20005                    )
                                  )
UNIVERSAL HEALTH SERVICES              )
OF D.C., Inc.                                            )
  P.O. Box 61558                                    )
  367 South Gulph Road                            )
  King of Prussia, PA 19406                       )
                                  )
Serve:  C T Corporation System               )
        1015 15th Street, N.W., Ste. 1000          )
        Washington, DC 20005                    )
                                  )
DISTRICT HOSPITAL PARTNERS, LP        )
                                  )
Serve:  CT Corporation System               )
        1015 15th Street, N.W., Suite 1000          )
        Washington, DC 20005                    )
                                  )

1

```
RICHARD B. BECKER, MD                    )
   121 Dekalb Avenue                      )
   Brooklyn, NY, 11201                    )
                                          )
DR. MICHAEL BERRIGAN                      )
   1917 Westfield Street                  )
   Alexandria, VA  22308                  )
                                          )
DR. PAUL DANGERFIELD                      )
   12811 Three Sisters Road               )
   Potomac, MD  20854                     )
                                          )
DR. JASON SANKAR                          )
   4803 Scarsdale Rd                      )
   Bethesda, MD  20816                     )
                                          )
DR. RONALD GURITZKY                       )
   10121 Sorrel Avenue                    )
   Potomac, MD  20854-5011                )
                                          )
             Defendants.                  )
_____)
```

## AMENDED COMPLAINT FOR DECLARATORY AND MONETARY RELIEF AND JURY DEMAND

### PRELIMINARY STATEMENT

1.      This is an action by plaintiff Dina Soliman, M.D., against defendants George

Washington University ("GWU"), and Medical Faculty Associates, Inc. ("MFA") for unlawful

discrimination on the basis of sex and retaliation in violation of Title VII of the Civil Rights Act

of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq., and the District of Columbia Human Rights Act

("DCHRA"), D.C. Code Ann. § 2-1401.01 et seq.; and against defendants Universal Health

Services of D.C., Inc. ("UHSDC"), District Hospital Partners, L.P. ("DHP"), Dr. Michael

Berrigan, Dr. Richard Becker, Dr. Paul Dangerfield, Dr. Jason Sankar, and Dr. Ronald Guritzky,

for aiding and abetting defendants GWU and MFA in their discriminatory and retaliatory actions

against Dr. Soliman, including but not limited to their driving her out of her job and making false

2

reports about her care and treatment of patients, in violation of the DCHRA; and against all

defendants for tortious interference with contractual relations.

## JURISDICTION AND VENUE

2.      This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, and this

court has supplemental jurisdiction over plaintiff's District of Columbia law claims under 28

U.S.C. § 1367.

3.      Venue is proper in this jurisdiction under 28 U.S.C. § 1391.

## PARTIES

4.      Plaintiff Dina Soliman, M.D. is a resident of Virginia who resides at 4811 Garden

Spring, Apt. #208, Glen Allen, VA 23059.  From August 1998 to January 26, 2007, she worked

for defendants GWU and MFA.  At all times relevant to this complaint, she worked at George

Washington University Hospital, which is jointly owned and operated by defendants GWU and

UHSDC, which are the two entities that make up defendant District Hospital Partners (DHP).

5.      Defendant GWU is a non profit corporation, organized and incorporated in the

District of Columbia, with its main headquarters at 2300 Eye Street, N.W., Washington, DC,

20037.  GWU's registered agent is Mary Lynn Reed, 2100 Pennsylvania, Ave., N.W., Suite 250,

Washington, DC, 20052.  Defendant GWU consists of, among other entities, the George

Washington University Hospital, defendant MFA, and the George Washington University School

of Medicine and Health Sciences.  Under the terms of defendant DHP's partnership agreement,

defendants GWU and UHSDC jointly own and operate George Washington University Hospital.

Defendant UHSDC holds an eighty (80) percent interest in the hospital and defendant GWU

holds a twenty (20) percent interest. At all times relevant to this complaint, defendant GWU was

conducting business in the District of Columbia.

3

6.     Defendant MFA is a non profit corporation organized and incorporated in the District of Columbia, with its headquarters at 2150 Pennsylvania Avenue, N.W., Suite 10-407, Washington, DC, 20037.  Defendant MFA's registered agent is Corporation Service Company, 1090 Vermont Ave., N.W., Washington, DC, 20005.  Defendant MFA is a medical practice group affiliated with defendant GWU, with its offices in defendant GWU's Ambulatory Care Center.  At all times relevant to this complaint, defendant MFA was conducting business in the District of Columbia.

7.     Defendant UHSDC is a corporation organized and incorporated in the State of Delaware.  Defendant UHSDC's headquarters is at 367 South Gulph Road, King of Prussia, PA, 19406.  Defendant UHSDC's registered agent is CT Corporation System, 1015 15th Street, N.W., Ste. 1000, Washington, DC, 20005.  Under the terms of defendant DHP's partnership agreement, defendants GWU and UHSDC jointly own and operate George Washington University Hospital. Defendant UHSDC holds an eighty (80) percent interest in the hospital and defendant GWU holds a twenty (20) percent interest. At all times relevant to this complaint, defendant UHSDC was conducting business in the District of Columbia.

8.     Defendant DHP is a limited partnership between defendant GWU and defendant UHSDC.  Defendant DHP's registered agent is CT Corporation System, 1015 15th Street, NW, Suite 1000, Washington, DC, 20005.  Under the terms of the DHP partnership, defendants GWU and UHSDC jointly own and operate George Washington University Hospital. Defendant UHSDC holds an eighty (80) percent interest in the hospital and defendant GWU holds a twenty (20) percent interest.  At all times relevant to this complaint, defendant DHP was conducting business in the District of Columbia.

9.     Defendant Dr. Richard B. Becker was an Associate Professor of Anesthesiology

and the Chief Executive Officer of the George Washington University Hospital.  Dr. Becker was

also the Chairman of the George Washington Hospital's Board of Governors at all times relevant

to this complaint.  His current address is 121 Dekalb Avenue, Brooklyn, NY, 11201.

10.     Defendant Dr. Michael Berrigan is a Professor of Anesthesiology and the

Chairman of the Department of Anesthesiology and Critical Care Medicine at defendant GWU

and defendant MFA. Defendant Berrigan is a resident of Virginia, and resides at 1917 Westfield

Street, Alexandria, Virginia, 22308.

11.     Defendant Dr. Paul Dangerfield is an Assistant Professor of Anesthesiology and

the Director of Clinical Anesthesia at defendant GWU and defendant MFA.  Defendant

Dangerfield is a resident of Maryland, and resides at 2811 Three Sisters Road, Potomac,

Maryland, 20854.

12.     Defendant Dr. Jason Sankar is an Assistant Professor of Anesthesiology and the

Director of Cardiac Anesthesia Education at defendant GWU and defendant MFA.  Defendant

Sankar is a resident of Maryland, and resides at 4803 Scarsdale Road, Bethesda, Maryland,

20816.

13.     Defendant Dr. Ronald Guritzky is an Assistant Professor of Anesthesiology and

the Director of Student Clerkship at defendant GWU and defendant MFA.  Defendant Guritzky

is a resident of Maryland, and resides at 10121 Sorrel Avenue, Potomac, Maryland, 20854-5011.

## FACTUAL ALLEGATIONS

14.     Dr. Soliman has a Medical Degree from the Cairo University Medical School and

trained in anesthesiology at Jackson Memorial Hospital, with subspecialty training at the

Cleveland Clinic Foundation, the Washington Hospital Center, and Brigham and Women's

Hospital.

15.     Before accepting a position with defendants GWU and MFA, Dr. Soliman had eight years of experience in cardiothoracic and vascular anesthesia.

16.     Dr. Soliman began working as a cardiothoracic anesthesiologist and as an Assistant Professor in the Department of Anesthesia and Critical Medical Care Medicine of defendant GWU in August 1998.

17.     During the first one and a half years of Dr. Soliman's employment with defendants GWU and MFA, she served as a cardiac anesthesiologist on the "Heart Team" in the Division of Cardiac Anesthesia.  Cardiac surgeons gave Dr. Soliman many compliments on her Heart Team work.  Residents she supervised as part of her work on the Heart Team gave her excellent reviews.

18.     Dr. Soliman was a faculty member of defendant GWU and was employed by defendants GWU and MFA.

19.     In 2000, Dr. Gertrude Mergner, the Director of Cardiac Anesthesia, removed Dr. Soliman from her position on the Heart Team without any explanation.

20.     Defendant GWU, including but not limited to Dr. Silva and defendants Becker, Berrigan Dangerfield and Guritzky, and defendant MFA, thereafter reassigned Dr. Soliman to work on emergency heart cases and weekend heart calls, in addition to her general cases.  The emergency cases were more difficult than the cases Dr. Soliman had handled while working on the Heart Team.

21.     In June of 2001, Defendant Sankar took over direction of the Heart Team, and Dr. Soliman applied for a position on the Team.

22.     While Dr. Soliman's application for a position on the Heart Team was pending, defendants Sankar and Berrigan spread false rumors among the hospital staff that Dr. Soliman

was having affairs with residents and was therefore a threat to residents and fellows.

23.    Defendant Sankar rejected Dr. Soliman's application for a position on the team, and instead chose male doctors for the Heart Team who were much less-qualified than Dr. Soliman, including defendant Dangerfield and defendant Guritzky.  Unlike Dr. Soliman, neither defendant Dangerfield nor defendant Guritzky was fellowship trained in cardiac anesthesiology or transesophageal echocardiography, certifications which were typically requirements for membership on the Heart Team.

24.    Beginning in or about August 1999, defendants Dangerfield and Sankar, who were responsible for scheduling anesthesiologists, routinely assigned Dr. Soliman to perform electroconvulsive therapy alone and to work alone in the electrophysiology ("EP") lab for long hours without breaks, much more often than they assigned her male colleagues to such tasks.

25.    Beginning in or about August 1999, defendants Dangerfield and Sankar rarely scheduled Dr. Soliman to teach or work with residents, while they regularly scheduled her male colleagues to teach or work with residents.  Specifically, they regularly scheduled themselves, Dr. Raymond Pla, Dr. Douglas Sharp, Dr. Michael Brennan and Dr. James Gould to work with residents.  Working with residents carried prestige and opportunities for advancement.  They refused to schedule her to work with residents even though she had a better relationship with male residents than any of her male colleagues, and was better qualified to work with them.

26.    On December 17, 2001, Dr. Soliman reported to defendant Berrigan that defendants Dangerfield and Sankar were discriminating against her on the basis of her gender by regularly scheduling her to work alone in the electroconvulsive therapy and EP labs, and had spread false and sexist rumors about her to keep her off the Heart Team.  She requested that defendant Berrigan schedule a meeting with defendants Sankar and Dangerfield to address their

discriminatory comments and discriminatory scheduling.

27.     Defendant Berrigan did not respond to Dr. Soliman's reports of discrimination.

28.     Upon information and belief, defendant Berrigan informed Drs. Sankar and Dangerfield about Dr. Soliman's complaints of sexual discrimination.

29.     Beginning in or about 2002, Dr. Soliman's male colleagues, including defendants Sankar and Dangerfield, subjected her to a pattern of discriminatory and retaliatory acts. Specifically, defendants Sankar and Dangerfield told other physicians that Dr. Soliman was incompetent, were hostile toward her when they were working together, and continued to limit her professional opportunities by denying her the opportunity to work with residents and assigning her to long hours alone in the EP lab.

30.     In early August 2002, Dr. Pla reported to Dr. Berrigan the false statements defendants Sankar and Dangerfield were making about Dr. Soliman, including the statements that she was incompetent.

31.     Dr. Pla recommended to defendant Berrigan that he reprimand defendants Dangerfield and Sankar for their hostile and abusive treatment of Dr. Soliman.

32.     Despite the reports from Dr. Pla about defendants' discriminatory and retaliatory actions against Dr. Soliman, defendant Berrigan failed to take any action or stop defendants' discriminatory and retaliatory treatment.

33.     Throughout the Fall of 2002, defendants Dangerfield and Sankar continued to make false statements to other physicians about Dr. Soliman's patient care.

34.     In the Fall of 2002, defendant Dangerfield also repeatedly questioned Dr. Soliman's judgment during surgeries in a public and abusive manner.  Dr. Dangerfield's actions were intended to discredit Dr. Soliman in front of her colleagues, residents, and Hospital staff.

35.     In October 2002, Dr. Soliman recommended to defendant Dangerfield that they not conduct surgery on a patient because there were abnormalities in the patient's blood tests. She made this recommendation, acting in the patient's best interests.  Defendant Dangerfield disagreed with Dr. Soliman in a loud and condescending tone in front of several of her colleagues, insisted that the surgery proceed, and assigned another anesthesiologist when Dr. Soliman refused to proceed because it was not clinically indicated.

36.     Throughout the Fall of 2002, Drs. Sankar and Dangerfield continued to limit Dr. Soliman's professional opportunities by denying her the opportunity to work with residents and assigning her to long hours alone in the EP lab, in retaliation for her reports of discrimination.

37.     On October 11, 2002, Drs. Sankar and Dangerfield assigned Dr. Soliman to work alone in the EP lab for seven hours without a break, in retaliation for her reports of discrimination.

38.     On December 22, 2002, Dr. Soliman sent defendant Berrigan an email reporting the discriminatory and retaliatory scheduling and slanderous remarks being made about her.  She also requested a meeting with defendants Sankar and Dangerfield to discuss the false statements they had made about her.  Defendant Berrigan did not take any steps to address Dr. Soliman's reports of discrimination and retaliation.

39.     On several other dates in the Winter of 2003, Dr. Soliman reported defendants' discriminatory treatment to defendant Berrigan, but he did not take any action.

40.     Beginning in or about 2003, defendant Berrigan began to give Dr. Soliman's male colleagues, many of whom had less experience than she did, administrative positions that came with significantly higher salaries.

41.     In fiscal year 2004, Dr. Soliman earned approximately two hundred and sixty-

nine thousand dollars ($269,000) per year, and had been practicing for five years after completing her residency.

42.     Dr. Soliman's male colleague defendant Guritzky finished his residency in 2001, and repeatedly failed the anesthesia board exam.  On or about 2003, before defendant Guritzky was board certified, defendants GWU and MFA made defendant Guritzky a Clinical Coordinator, which meant that he shared responsibility for running the operating room with four other male colleagues.  As a result, defendant Guritzky earned approximately three hundred thousand dollars ($300,000) per year, even though he had less experience and was not as qualified as Dr. Soliman.

43.     Dr. Soliman's male colleague defendant Dangerfield finished his residency in 1998, and is not fellowship or cardiac trained.  Defendants GWU and MFA made defendant Dangerfield  manager of the operating room in 1999, and the Director of Clinical Anesthesia and a Clinical Professor in 2004.  As a result, defendant Dangerfield earned, upon information and belief, between three hundred and twenty-five thousand dollars ($325,000) and three hundred and fifty thousand dollars ($350,000) per year, even though he was equally or less qualified than Dr. Soliman.

44.     On January 7, 2003, Dr. Pla told Dr. Soliman that defendants Sankar and Dangerfield were "out to get" Dr. Soliman.

45.     On January 12, 2003, Dr. Soliman sent defendant Berrigan an email in which she reported the discriminatory and unfair scheduling, and again requested a meeting with defendants Sankar and Dangerfield.  Defendant Berrigan did not respond or take any action to stop the discriminatory treatment.

46.     Dr. Soliman emailed defendant Berrigan again on February 5, 2003, to request a

meeting with defendants Dangerfield and Sankar to discuss their discriminatory treatment of her. Again, defendant Berrigan refused to schedule a meeting or to take action to stop the discrimination and retaliation against Dr. Soliman.

47.     On March 18, 2003, during a surgery, Dr. Paul Manner walked into the operating room and criticized Dr. Soliman's care in a loud and abusive manner in front of the surgical team, in an obvious way that undermined and discredited her in front of the residents.

48.     Throughout 2003, defendant Dangerfield refused to schedule Dr. Soliman to work with residents, although he regularly scheduled male physicians to work with residents.

49.     On May 12, 2004, Dr. Brian McGrath and defendant Sankar aggressively criticized Dr. Soliman while she was speaking in front of numerous physicians and hospital staff. Neither defendant Sankar nor Dr. McGrath had experience with, or knowledge of, the subject on which she was presenting; nor were their criticisms based on scientific evidence. Upon information and belief, no doctor ever addressed male doctors in a similar hostile and unprofessional manner during their public presentations.

50.     On May 14, 2004, Dr. Soliman emailed defendant Berrigan to request that he address Dr. McGrath's hostile and discriminatory behavior. Defendant Berrigan never responded to the email, and did not take any action to stop the hostile and abusive conduct.

51.     On July 21, 2004, Dr. Soliman emailed defendant Berrigan. In the email, she reminded defendant Berrigan that the defendants Dangerfield's and Sankar's discriminatory scheduling and retaliatory actions had continued for several years, and that Dr. Berrigan had failed to take any concrete action. In her email to defendant Berrigan, Dr. Soliman stated that the scheduling was damaging her career and her reputation. Defendant Berrigan did not respond to Dr. Soliman's July 21, 2004 email, and refused to take any action to stop the ongoing

11

discrimination and retaliation against her.

52.     On February 15, 2005, Dr. Soliman's attorney sent a letter to defendant MFA's General Counsel, Mark Tatelbaum, and defendant GWU's Associate General Counsel, Mary Lynn Reed, stating that the defendants had discriminated and retaliated against Dr. Soliman by refusing to allow her to work on the Heart Team, paying her less than male colleagues, and creating a hostile work environment.  The letter also informed defendants MFA and GWU that since defendant Sankar became the Chief of the Heart Team, defendant Sankar had selected no women physicians to work on the Heart Team.  The letter also reported that defendants Sankar and Dangerfield had spread false, sexist and malicious rumors that Dr. Soliman had had affairs with residents.

53.     After Dr. Soliman's attorney notified officials at defendants MFA and GWU of Dr. Soliman's discrimination and retaliation claims, defendants' hostile retaliatory treatment escalated.

54.     Defendants Dangerfield, Sankar and Guritzky denied Dr. Soliman the opportunity to work with any residents throughout 2005, while her male colleagues were given opportunities to work with residents.

55.     Defendants Dangerfield, Sankar and Guritzky routinely scheduled Dr. Soliman to work long hours alone in the EP lab throughout 2005, while her male colleagues were not scheduled to work long hours alone in the EP lab, and were given breaks.

56.     On February 24, 2005, Dr. Soliman was involved in a near-fatal car accident.  She informed defendant Sankar by telephone that she would be delayed by several hours in arriving for her shift on February 25, 2005.  On the morning of February 25, 2005, defendant Dangerfield called Dr. Soliman and told her in a threatening tone of voice that she had to be at work by 9:30

a.m., despite Dr. Soliman's report to defendant Sankar about her accident.  Defendant

Dangerfield's actions were clearly retaliatory and part of a scheme to create a false record of Dr.

Soliman's performance to force her to resign.

57.     In an email to Defendant Berrigan on February 27, 2005, Dr. Soliman reported

Dr. Dangerfield's actions following the near-fatal car accident on February 24, 2005.  She also

"plead[ed]" for "a more peaceful [work] environment," a reference to the harassment she had

endured.  Defendant Berrigan did not respond to Dr. Soliman's February 27, 2005 email.

58.     On May 9, 2005, defendant Dangerfield said to Dr. Soliman in a threatening tone,

"you don't know what the surgeons, residents and nurses are saying about you in the hallway."

Defendant Dangerfield's actions were retaliatory and intended to drive Dr. Soliman out of her

employment.

59.     In June 2005, Dr. Soliman met with defendant Berrigan and Dr. Cindy Tracy, a

cardiologist from the EP lab, to discuss EP lab and safety issues.  During the meeting, Dr. Tracy

told defendant Berrigan that Dr. Soliman was frequently scheduled to work alone in the lab

without residents and with fewer breaks than the other anesthesiologists received.  Dr. Tracy

explained to defendant Berrigan that the lab environment could be oppressive, and that the norm

was to schedule at least two breaks per shift.

60.     After the June 2005 meeting, defendant Berrigan took no action to prevent

defendants Sankar and Dangerfield from retaliating against Dr. Soliman by assigning her to work

long hours alone in the EP lab without breaks.

61.     On June 27, 2005, Dr. Soliman emailed defendant Berrigan to report that

defendants Dangerfield, Sankar, and Guritzky had refused to assign her to work with residents

for the fifth year in a row, despite her repeated requests and contributions to the department.

Defendant Berrigan took no action to remedy the situation.

62.     Dr. Soliman met with defendant Berrigan to discuss her complaints of

discrimination and harassment on June 30, 2005, and again on July 6, 2005.  Defendant Berrigan

still took no action to stop the escalating retaliation against her.

63.     Dr. Soliman emailed defendant Berrigan on July 7, 2005, and July 10, 2005, to

reiterate her request that she be assigned to work with residents, and to report that defendants'

refusal to allow her to work with residents was damaging her career.  On July 11, 2005,

defendant Berrigan, in an email sent to Dr. Soliman, claimed that he had spoken with defendants

Sankar and Guritzky about her "request," and that he would speak to the other doctors as well.

Defendant Berrigan's email did nothing to stop defendants' refusal to assign Dr. Soliman to

work with residents.

64.     On October 12, 2005, Dr. Soliman and her attorney met with defendant Berrigan

and Mr. Tatelbaum, General Counsel for defendant MFA, to discuss Dr. Soliman's harassment,

discrimination and retaliation complaints.  Dr. Soliman's attorney followed up with a letter dated

October 29, 2005, which confirmed Dr. Soliman's previous allegations.  Defendant Berrigan and

Mr. Tatelbaum took no action to stop the discriminatory treatment.

65.     Throughout October and November 2005, defendant Dangerfield kept Dr.

Soliman from working with residents and assigned her to work alone on the Pain Service, in the

obstetrics ward, and in the EP lab.

66.     On February 6, 2006, Dr. Soliman's attorney told defendants GWU and MFA that

defendant Berrigan had evaluated Dr. Soliman unfairly because defendants had denied her the

opportunity to work with residents.  The performance evaluations were unfairly based on

resident evaluations from residents who had had very little opportunity to work with Dr.

14

Soliman.  As a result, her performance evaluations did not reflect her accomplishments or contributions.  Her attorney's letter stated that the defendants' discriminatory and retaliatory actions had damaged Dr. Soliman's reputation and restricted her future career opportunities.

67.    On February 17, 2006, Dr. Soliman emailed Defendant Berrigan to complain about the unequal EP lab assignments that kept her from spending time with the visiting professor.  Defendant Berrigan did not take any action to stop the discrimination and retaliation.

68.    On March 1, 2006, Dr. Joshua Katz, a surgeon, unfairly criticized Dr. Soliman's work in front of her colleagues, and spoke to her in a threatening and abusive manner, while she was trying to insert Epidural Depodur for post-operative pain control, despite the difficulty of inserting the epidural because of the patient's rheumatoid arthritis.  Drs. Katz and Pla then stood outside the operating room and baselessly criticized Dr. Soliman's competence.

69.    In May 2006, Dr. Soliman met with Dr. James Scott, the Dean of defendant GWU's Medical School, to report the defendants' discriminatory and retaliatory treatment of her. Dr. Scott told Dr. Soliman that he would make every effort to stop the illegal treatment, and that he would meet with defendant Berrigan to discuss her reports of discrimination and retaliation. Upon information and belief, Dr. Scott did not take any action to stop the defendants' discrimination and retaliation.

70.    On May 23, 2006, Dr. Soliman followed up with Dr. Scott regarding defendants' discriminatory and retaliatory treatment.  She described defendants' actions as "discriminatory," stated that she had been "denied an equal opportunity," and reported that she was being subjected to a "hostile working environment."

71.    In or about June 2006, Dr. Soliman discussed her annual report of her work with defendant Berrigan.  The report listed the chairmanships she had taken, the symposiums and

lectures in which she had participated, and the abstracts she had presented, among other things. She then signed the annual report and left it with defendant Berrigan.

72.     On July 1, 2006, Dr. Soliman accessed her annual report through her online personnel file.  When she opened the document, she discovered that it was not the document she had discussed with defendant Berrigan and signed.  Instead, defendant Berrigan had posted a blank report, which Dr. Soliman had not seen or agreed to.  Defendant Berrigan had attached the signature page from the original report, which Dr. Soliman had signed.  The Dean of the Medical School reviews annual reports with defendant Berrigan, and a blank report would reflect badly on Dr. Soliman.

73.     Upon information and belief, defendant Berrigan posted the false report intentionally and deliberately in order to harm Dr. Soliman's reputation and as part of the individual defendants' plan to drive Dr. Soliman out of her job.

74.     On August 17, 2006, Dr. Soliman sent defendant Berrigan an email complaining about the falsified annual report.  Defendant Berrigan refused to change the false report before he and the Dean discussed and signed it.  It was not until after the Dean and Berrigan met, and after Dr. Soliman's complaints, that defendant Berrigan posted the correct annual report.  Defendant Berrigan's sending the false report to the Dean reflected badly on Dr. Soliman.

75.     In August 2006, Dr. Soliman applied for a position at Holy Cross Hospital in Silver Spring, Maryland.  Upon information and belief, defendants Berrigan and Dangerfield falsely criticized her performance to officials at Holy Cross, leading Holy Cross to deny her the position.

76.     On September 4, 2006, Dr. Soliman was the attending anesthesiologist for a surgical procedure on a patient whose obesity significantly increased the risks associated with

the surgery.  Before the patient went to surgery, nurses had difficulty obtaining reliable blood

pressure measurements.  The patient's surgery proceeded uneventfully, except for the challenges

of measuring the patient's blood pressure.  Five hours after the patient was released from the

recovery room in stable condition, the patient suffered cardiac arrest while in the Intensive Care

Unit ("ICU"), which caused extensive brain damage, which ultimately resulted in the patient's

death.  While the patient was in the ICU, the ICU staff also had difficulty obtaining reliable

blood pressure measurements.

      77.    On September 12, 2006, in a letter to the Medical Director, Dr. Carlos Silva,

defendants Berrigan and Guritzky falsely claimed that the lack of a reliable blood pressure

measurement, before and during the induction of anesthesia to the patient, was because of Dr.

Soliman's provision of substandard care to the patient.  Defendants Berrigan and Guritzky's

letter falsely blamed Dr. Soliman for the patient's death, and covered up the mistakes of the other

physicians and staff who were responsible for the patient's death.  Defendants also falsely

claimed that only Dr. Soliman had difficulty in obtaining a reliable blood pressure measurement,

when in fact other staff had had the same difficulty because of the patient's obesity.  They also

falsely criticized Dr. Soliman's failure to check on the patient after surgery, even though they

knew that she was not responsible as the residents attending to the patient told Dr. Soliman that

her assistance was not needed.  Defendants Berrigan and Guritzky were forced to admit that Dr.

Soliman's difficulty in obtaining a reliable blood pressure measurement during surgery did not

create a "life-threatening situation."

      78.    Based on this false report, on September 15, 2006, Dr. Silva summarily suspended

Dr. Soliman's Medical Staff Membership and clinical privileges.  He sent her a "Notice of

Summary Suspension and Expedited Article 6 Hearing."  In that notice, Dr. Silva alleged falsely

that Dr. Soliman's care had been the cause of the patient death, and indicated that an ad hoc review committee would review the summary suspension.

79.    The Bylaws of the Medical and Dental Staff of the George Washington University Hospital ("Bylaws"), which were created and ratified by defendants GWU, UHSDC and DHP, clearly state that "[a] Medical Staff member whose Clinical Privileges have been summarily suspended shall be entitled to hearing before a fair hearing board as provided in Article 7 of these Bylaws."  Bylaws, Section 6.2.1.

80.    By summarily suspending Dr. Soliman's Medical Staff Membership and clinical privileges, and then immediately subjecting her to an "Expedited Article 6 Hearing," defendants GWU, UHSDC and DHP failed to follow their own procedures, and denied Dr. Soliman the due process protections she was entitled to under Article 7 of the Bylaws.  Upon information and belief, defendants circumvented the Article 7 protections in order to drive Dr. Soliman out of her job.

81.    If defendants had complied with the Bylaws, defendants DHP, UHSDC and GWU, including but not limited to Dr. Silva and defendants Becker, Berrigan Dangerfield and Guritzky, should have provided Dr. Soliman with a formal, recorded hearing, the right to legal representation, the right to testify on her own behalf, and the right to present witnesses and rely on documentary evidence at the hearing pursuant to Article 7 of the Bylaws.  Defendants DHP, UHSDC and GWU, including but not limited to Dr. Silva and defendants Becker, Berrigan Dangerfield and Guritzky, purposefully circumvented this process.

82.    The Bylaws state that "[t]he responsibility of the conduct of administrative procedures, budgets, personnel and maintenance of the plant and equipment remain with the Board [of Governors] and the Hospital's Chief Executive Officer [defendant Becker]."  It was

18

therefore defendant Becker's responsibility, as Chairman of the Board and CEO, to see that the
Bylaws were followed, in terms of defendants' prosecution of and adverse actions against Dr.
Soliman.

83.     Defendant Becker was the Chairman of the Board of Governors and CEO of
George Washington Hospital, and as the Chairman and CEO, he ratified and approved the
summary suspension of Dr. Soliman's Medical Staff Membership and clinical privileges, and the
denial of the Article 7 due process protections, even though he knew or should have known, that
the charges against Dr. Soliman were false and that she was being denied the due process
protections she was entitled to.

84.     On September 21, 2006, the ad hoc review committee held a meeting to review
defendant Berrigan's false report.  According to the Report of the Committee's Meeting,
Defendant Berrigan participated in the meeting as a witness, even though he knew, or should
have known, that the charges against Dr. Soliman were false and that she was being denied the
due process protections she was entitled to.

85.     Dr. Soliman also spoke at the ad hoc committee meeting.  While she was waiting
outside the room where the meeting was being held, she overheard committee members saying,
"why are we here?," "[Dr. Soliman] hasn't done anything," and "she got the patient through the
operating room."

86.     The ad hoc committee unanimously reinstated Dr. Soliman's Medical Staff
Membership and clinical privileges, but conditioned the reinstatement on a six-week "internal
confidential peer review" of Dr. Soliman's charts.

87.     On September 25, 2006, Dr. Soliman and her attorney met with Dr. Silva to
discuss the ad hoc committee's findings.  Dr. Silva told them that the investigation of the patient

death "is over; it's closed."

88.     Despite Dr. Silva's assurances, defendants DHP, UHSDC and GWU, including but not limited to Dr. Silva and defendants Becker, Berrigan Dangerfield and Guritzky, and defendant MFA, continued to monitor Dr. Soliman in order to retaliate against her and drive her out of her position.  Section 6.5.1 of the Bylaws sets forth what actions the ad hoc committee can take.  Even if the ad hoc committee process had been the proper process to review the summary suspension in this case, which it was not, nothing in the Bylaws allowed the ad hoc committee to institute a six-week peer review period.  By subjecting Dr. Soliman to an improper peer review period, defendants DHP, UHSDC and GWU, including but not limited to Dr. Silva and defendants Becker, Berrigan Dangerfield and Guritzky, and defendants MFA, UHSDC and DHP, continued to circumvent their own procedures in an effort to drive Dr. Soliman out of her job.

89.     On October 4, 2006, the ad hoc committee released a written report of its findings.  According to the report, the committee's recommendations had been forwarded to the Executive Committee of the Board of Governors, of which Defendant Becker was a member.  The Executive Committee of the Board of Governors, including Defendant Becker, agreed to accept the committee's recommendations "with the exception that [Dr. Soliman] be given formal counseling on the matter and that this counseling be recorded into [her] Medical Staff file." (emphasis in original).

90.     Section 9.5 of the Bylaws states, "[i]t is the responsibility of the Medical Executive Committee… to conduct hearings and other functions provided herein, including as set forth in these Bylaws the recommendation to the Board of applicants for appointment and reappointment to membership on the Medical Staff and attendant clinical privileges; to conduct peer review activities… and direct the conduct of such activities throughout the Hospital as

contemplated by applicable law and regulation…"  The CEO of the Hospital, defendant Becker, is an ex-officio member of the Medical Executive Committee.

91.    Section 7.1 of defendant GWU's Bylaws states that Dr. Soliman had the right to appeal this decision because it adversely impacted her "status as a member of the Medical Staff." Defendants DHP, UHSDC and GWU, including but not limited to Dr. Silva and defendants Becker, Berrigan, Dangerfield and Guritzky, did not provide Dr. Soliman the right to appeal, even though they knew or should have known that she was entitled to an appeal.  Upon information and belief, defendants denied Dr. Soliman the right to appeal even though they knew she had that right, in a continued effort to drive her out of her job.

92.    On December 1, 2006, Dr. Panos Labroupolos, a member of the ad hoc review committee, told Dr. Soliman that he and other members of the ad hoc review committee did not believe defendants should have suspended her Medical Staff Membership and clinical privileges.

93.    The "internal confidential peer review" ordered by the ad hoc review committee was conducted by defendant Guritzky, and submitted to the Medical Staff Peer Review Committee.

94.    In an October 3, 2006 letter to Dr. Silva, Dr. Soliman objected, through counsel, to defendant Guritzky reviewing the cases, because she did not believe that defendant Guritzky would conduct an unbiased review as he had discriminated and retaliated against her in the past by making false and defamatory statements about her, refusing to schedule her to work with residents, and giving her harsh and unfair schedules in the EP lab.  Defendants DHP, UHSDC and GWU, including but not limited to Dr. Silva and defendants Becker, Berrigan, Dangerfield and Guritzky, and defendant MFA ignored her complaints about defendant Guritzky's demonstrated bias against her.

21

95.     In or about October of 2006, Dr. Soliman applied for an opening at New England Medical Center.  Upon information and belief in December 2006, officials at defendants GWU and MFA falsely criticized Dr. Soliman's performance to officials at New England Medical Center, leading to the New England Medical School's rejection of her application.

96.     In or about December 2006, Dr. Soliman sought a license in Massachusetts, as part of her application for employment at New England Medical Center.  Dr. Soliman hired a company to assist with her licensure.  The company told Dr. Soliman that Dr. Silva sent a negative evaluation to the Massachusetts licensing authorities, which would adversely impact Dr. Soliman's chances of obtaining a Massachusetts license.  As a result, Dr. Soliman decided not to pursue her application for a license in Massachusetts.

97.     On January 8, 2007, defendant Guritzky submitted his "Report to the Ad Hoc Committee" regarding Dr. Soliman's cases.  In that report, defendant Guritzky falsely criticized Dr. Soliman's performance in six cases, in order to drive her out of her job by creating a false record of poor performance.  Out of more than eighty cases in which Dr. Soliman had provided medical care during the six-week period, defendant Guritzky commented on ten cases.  In four of the cases, defendant Guritzky acknowledged that Dr. Soliman's care had met the standard of care.

98.     In one of the remaining six cases, defendant Guritzky falsely criticized Dr. Soliman for using an arterial line to monitor a patient, although she had done so in order to monitor the high-risk patient more carefully, pursuant to recommendations from the American Society of Anesthesiologists ("ASA").  In the second case, defendant Guritzky falsely faulted Dr. Soliman's decision to have cardiac evaluations conducted on two patients, although she had done so in accordance with ASA guidelines.  In the third case, defendant Guritzky falsely alleged that

22

Dr. Soliman chose an inappropriate method of post-operative pain control, even though the patient and a resident told Dr. Soliman that the patient did well on the pain control. In the fourth case, defendant Guritzky falsely claimed that the patient was under-resuscitated, but later admitted that the under-resuscitation was a problem before Dr. Soliman became involved in the case, and was therefore, not her fault. In the fifth case, defendant Guritzky falsely criticized Dr. Soliman for objecting to the surgeon's plan to obtain informed consent from a patient who was disoriented and confused. Dr. Soliman suggested appropriate alternatives, but the surgeon ignored her advice and had another anesthesiologist assist him, even though the patient remained confused. In the sixth case, defendant Guritzky falsely criticized Dr. Soliman's response to an apneic episode, which is a common problem among geriatric patients treated with particular medications. Dr. Soliman treated the problem, and the patient fully recovered without further complications.

99.    On January 18, 2007, the Medical Staff Peer Review Committee that defendants GWU, UHSDC and DHP set up to evaluate defendant Guritzky's report, met. The committee invited Dr. Soliman to attend the meeting, but did not give her the opportunity to submit a rebuttal prior to the meeting or present testimony of an expert witness opinion at the meeting.

100.    Before she could enter the Medical Staff Peer Review Committee meeting on January 18, 2007, Dr. Soliman was paged to care for a patient in the obstetrics ward. When she was eventually able to return, only the Chairman of Committee, Dr. Claudia Ranniger, met with her.

101.    Dr. Ranniger told Dr. Soliman that there were a lot of problems and friction in the anesthesiology department, which were influencing the Medical Staff Peer Review Committee's review of defendant Guritzky's report on Dr. Soliman's patient care. The clear implication of

Dr. Ranniger's statement was that the committee had not found a patient care issue.

102.    Dr. Ranniger asked Dr. Soliman to write a rebuttal to defendant Guritzky's report and a statement regarding the patient death.

103.    On January 24, 2007, Dr. Soliman submitted her rebuttal to defendant Guritzky's report to Dr. Ranniger.

104.    On January 26, 2007, Dr. Soliman "resign[ed] as a faculty member" at GWU, as she stated in her letter of resignation, and took a position with Virginia Commonwealth University ("VCU").

105.    On January 29, 2007, defendants GWU, UHSDC, DHP and MFA falsely notified the National Practitioner Databank ("NPDB") that Dr. Soliman had resigned her "privileges… while under investigation."

106.    At no time did Dr. Soliman surrender her privileges.  As she stated in her resignation letter, she merely "resign[ed] as a faculty member," which meant she was no longer eligible for privileges.  She did not resign or surrender her privileges due to disciplinary action, but rather, no longer maintained privileges as an effect of her resignation, and ineligibility for privileges.

107.    The false report to the NPDB by defendants GWU, UHSDC, DHP and MFA that Dr. Soliman had resigned her clinical privileges while under investigation has harmed her reputation and interfered with her ability to practice medicine.

108.    Due to defendants' false report to the NPDB, Dr. Soliman was unable to begin working at VCU until May 14, 2007.

109.    Due to defendants' report to the NPDB, Dr. Soliman had difficulty securing the proper privileges at VCU, had no privileges for a month after she began working there, and had

only temporary privileges for six months.

110.    On February 4, 2007, in an additional response to Dr. Guritzky's report, Dr. Soliman submitted to Dr. Ranniger her statement regarding the patient death.  Dr. Soliman's submission explained that she used standard monitoring, and that she repeatedly reported difficulties placing an arterial line, but that the patient stabilized later in the surgery.  She also explained that it would have been impossible to start the procedure with invasive blood pressure monitoring.

111.    In February 2007, the Medical Staff Peer Review Committee pursued further peer review of the six cases defendant Guritzky had discussed in his report, even though defendants' procedures made no basis for such a review.  The Medical Staff Peer Review Committee sent descriptions of the cases to Dr. Paul Mongan at the Uniformed Services University of the Health Sciences, along with a list of questions from the Committee.

112.    On February 22, 2007, Dr. Mongan released his answers to the Peer Review Committee's questions regarding six of Dr. Soliman's patients.  Dr. Mongan falsely claimed that five of the cases raised concerns about patient care.

113.    On April 8, 2007, Dr. Soliman submitted a rebuttal to Dr. Mongan's report, explaining that the inaccuracies and false statements in Dr. Mongan's report were similar to those in Dr. Guritzky's report.  She also objected to Dr. Silva's refusal to allow her to choose her own external reviewer.

114.    On April 18, 2007, at Dr. Soliman's request, Dr. Fawzy Estafanous, Chairman of the Division of Anesthesiology, Critical Care Medicine & Comprehensive Pain Management at the Cleveland Clinic, submitted his own evaluation of the six cases.  Dr. Estafanous stated that Dr. Mongan's report was biased because he had responded to pre-determined leading questions

from the Medical Staff Peer Review Committee.  Dr. Estafanous also found that Dr. Mongan's

criticism of Dr. Soliman's care was based on subjective and acceptable differences in safe

anesthetic management, and that Dr. Soliman had at no time jeopardized any patient.

115.    In or about February of 2007, defendant Berrigan admitted to Dr. Soliman's

Department Chair at VCU, that the death of the patient in the ICU was not in any way Dr.

Soliman's fault.

116.    On September 6, 2007, Dr. Soliman filed a timely charge of discrimination with

the Equal Employment Opportunity Commission (EEOC).

117.    On April 2, 2008, the EEOC issued Dr. Soliman a Notice of Right to Sue.  Dr.

Soliman received the Notice on April 3, 2008, and filed this complaint on June 30, 2008, within

90 days of the Right to Sue Notice.

COUNT ONE
TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS
AGAINST ALL DEFENDANTS

118.    Plaintiff hereby restates and incorporates by reference the paragraphs above, as

though fully set forth herein.

119.    Plaintiff was forced to resign her position due to the defendants' retaliatory and

discriminatory actions disclosed above.

120.    Prior to plaintiff's forced resignation, plaintiff enjoyed a valid and profitable

employer-employee relationship with defendants GWU and MFA.

121.    As a result of her years of successful employment with defendants GWU and

MFA and her reputation as a superb physician and faculty member, plaintiff had a valid

expectation of advantageous business relations, opportunities and continued employment at

GWU.

26

122.    Plaintiff also had a valid expectation that defendants would accurately describe her successful employment at GWU and MFA, and that defendants would do nothing to interfere with her expectation of entering into an employment and business relationship with other hospitals, if she chose to do so.

123.    Plaintiff had a legitimate expectation that defendants would do nothing to interfere with the expectations described above.

124.    The defendants interfered with and caused termination of plaintiff's expectations of advantageous business relations when they intentionally, maliciously and falsely criticized plaintiff's performance with the intention of creating a false record, which defendants used to drive plaintiff out of her job.

125.    Defendants' conduct described above, was intentional, or alternatively, so reckless as to demonstrate a substantial lack of concern for whether injury would result.

126.    As a direct result of the defendants' conduct, the employment relationship between plaintiff and defendants GWU and MFA was adversely affected, forcing plaintiff to resign on January 26, 2007.

127.    Defendants also interfered with and caused termination of plaintiff's expectations of advantageous business relations when they intentionally, maliciously and falsely criticized Dr. Soliman's performance with the intention of creating a false record that caused potential employers to refuse to consider Dr. Soliman for employment.

128.    Defendants' conduct described above, was intentional or alternatively, so reckless as to demonstrate a substantial lack of concern for whether injury would result.

129.    As a direct result of the defendants' conduct, the prospective business relationship between plaintiff and potential employers was adversely affected, and lead Dr. Soliman's

prospective employers to deny her jobs.

130.    Defendants knew Dr. Soliman sought employment in Massachusetts, and that she needed to become licensed in Massachusetts in order to pursue employment at New England Medical Center, in Boston, Massachusetts.

131.    Plaintiff had a legitimate expectation that defendants would do nothing to interfere with her expectation of obtaining licensure in Massachusetts.

132.    Despite plaintiff's expectations, the defendants interfered with and caused termination of plaintiff's expectations of advantageous business relations when they intentionally, maliciously and falsely criticized Dr. Soliman's performance with the intention of creating a false record that would lead Massachusetts licensing authorities to deny plaintiff's application for a Massachusetts license.

133.    Defendants' conduct described above was intentional, or so reckless as to demonstrate a substantial lack of concern for whether injury would result.

134.    In addition, as a direct result of the defendants' interference with plaintiff's Massachusetts license application, the prospective business relationship between plaintiff and New England Medical Center was adversely affected and ultimately lead to the New England Medical Center denying Dr. Soliman the job for which she had applied.

135.    The conduct of defendants, as described herein, was done intentionally, maliciously, with unlawful purpose to cause such damage and loss, and without right or justifiable cause, thereby warranting punitive damages.

136.    The actions of defendants directly and proximately caused plaintiff loss of income and other economic benefits; loss of future income and benefits; loss of future employment opportunities; impaired her future earning capacity; damaged her professional reputation; and

caused her emotional pain and suffering.

COUNT TWO
DISCRIMINATION IN VIOLATION OF TITLE VII AND
THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT
AGAINST DEFENDANTS GWU AND MFA

137.    Plaintiff hereby restates and incorporates by reference the paragraphs above, as though fully set forth herein.

138.    Under Title VII it is unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's… sex." 42 U.S.C. § 2000e-2(a).

139.    Under the D.C. Human Rights Act, it is unlawful for an employer to "discriminate against any individual, with respect to his compensation, terms, conditions, or privileges of employment, including promotion; or to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities, or otherwise adversely affect his status as an employee," on the basis of sex. D.C. Code Ann. § 2-1402.11(a)(1).

140.    Defendants GWU and MFA are covered "employer[s]" under both Title VII and the D.C. Human Rights Act.

141.    Defendants subjected Dr. Soliman to an escalating pattern of discriminatory treatment over a period of three years by repeatedly passing Dr. Soliman over and choosing less qualified men to work on the Heart Team; refusing to assign residents to work with Dr. Soliman, thereby barring her from teaching residents; isolating and injuring Dr. Soliman by routinely scheduling her to work long hours, by herself, without breaks; making false comments about her professional competence in front of her colleagues, residents, and Hospital staff in order to

29

denigrate and humiliate her; refusing to give her administrative titles, which depressed her pay

and curtailed her professional advancement appropriately; paying her less than similarly-situated

male colleagues; and ultimately creating a false record of alleged professional incompetencies,

and writing bogus internal investigations in order to submit false reports to the National

Practitioners Data Bank (NPDB) and drive Dr. Soliman out of her job.

142.    Defendants' discriminatory actions created intolerable working conditions that

ultimately forced Dr. Soliman to resign.

143.    After driving her out of her job, defendants further discriminated against her by

falsely notifying the NPDB that she had resigned her clinical privileges while under

investigation.  In fact, Dr. Soliman was no longer eligible for privileges once she resigned her

position at GWU to accept a position at VCU.

144.    Defendants' actions described above constitute unlawful sex discrimination

against Dr. Soliman in violation of Title VII and the DCHRA.

145.    Defendants' unlawful discrimination damaged Dr. Soliman's physical health, and

caused her substantial pain and suffering, severe emotional distress and humiliation.

146.    Defendants' conduct, in reckless disregard for Dr. Soliman's federally-protected

civil rights, was intentional, malicious, done in bad faith and for the purpose of harming her, and

outrageous.

147.    Defendants' violations of Title VII and the DCHRA directly and proximately

caused Dr. Soliman loss of income and other economic benefits, job search costs, loss of future

employment opportunities, impairment of her future earning capacity, and damage to her

professional reputation.

COUNT THREE

RETALIATION IN VIOLATION OF TITLE VII
AND THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT,
<u>AGAINST DEFENDANTS GWU AND MFA</u>

148.    Plaintiff hereby restates and incorporates by reference the paragraphs above, as

though fully set forth herein.

149.    Title VII provides that it is unlawful to retaliate against an employee "because he

has opposed any practice made an unlawful employment practice by this subchapter, or because

he has made a charge … under this subchapter."  42 U.S.C. § 2000e-3(a).

150.    Under the D.C. Human Rights Act, it is "an unlawful discriminatory practice to

coerce, threaten, retaliate against, or interfere with any person in the exercise or enjoyment of, or

on account of having exercised or enjoyed …  any right granted or protected under" the District

of Columbia Human Rights Act.  D.C. Code § 2-1402.61.

151.    Defendants GWU and MFA are covered "employer[s]" under both Title VII and

the D.C. Human Rights Act.

152.    Dr. Soliman repeatedly made discrimination complaints to defendant Berrigan,

her Department Chair, in person and by emails, starting on December 17, 2001.  Her attorney

sent letters to defendants' attorneys on February 15, 2005 and February 6, 2006, complaining

about discrimination and ongoing retaliation, met with defendants and their counsel on October

12, 2005; September 25, 2006; and October 3, 2006; and write a further letter on October 29,

2005.

153.    After defendants received these letters and met with Dr. Soliman and her attorney

to discuss her complaints, defendants escalated their retaliation against Dr. Soliman by (a)

refusing to schedule Dr. Soliman with residents, for over five years in a row, (b) scheduling her

for long hours, often alone and without the opportunity for breaks, (c) subjecting her to

discriminatory public criticism, including making false statements about her judgment during

surgeries, (d) giving her male colleagues administrative positions with higher compensation,

even though they were less or equally qualified as was Dr. Soliman for those positions, (e)

refusing to select her (or other female colleagues) to work on the Heart Team, (f) gave her

negative evaluations based on comments from individuals who had little knowledge of her work,

(g) gave lab assignments in a manner that precluded her from spending time with a visiting

faculty member, in contrast to others who had greater access to that visiting professor, (h)

deleted her annual report for the Dean and replaced it with a blank document, (i) falsely

criticized her performance to hiring officials at other medical institutions, (j) falsely accused her

of being responsible for the death of a patient, (k) suspended her Medical Staff Membership and

clinical privileges, (l) required her to have a six-week peer review of her medical charts, (m)

falsely gave a negative evaluation to the Massachusetts licensing authorities, and (n) falsely told

the National Practitioner Data Bank that Dr. Soliman had resigned her privileges while under

investigation, all in an effort to create a hostile work environment that would induce Dr. Soliman

to leave her job.

154.    Upon information and belief, defendants have further retaliated against Dr.

Soliman by giving false and defamatory information to employers to which Dr. Soliman applied,

thereby leading these employers to reject Dr. Soliman for jobs for which she applied.

155.    Defendants also provided false and defamatory information to the Massachusetts

licensing authorities which lead them to delay them granting a medical license to Dr. Soliman,

which damaged her professional advancement, and ability to obtain a job in Massachusetts.

156.    In a calculated effort to force Dr. Soliman out of her job, defendants further

retaliated against her by summarily suspending her based on false criticisms about her patient

care, and then after reinstating her, initiating biased and unauthorized investigations into Dr. Soliman's patient care. Although the investigations failed to uncover any valid problems with Dr. Soliman's patient care, defendants used the investigations to harass Dr. Soliman and create intolerable working conditions so that she would be compelled to resign.

157.    After she resigned to take a job at VCU, defendants further retaliated against her by filing a false report in the National Practioners Data Bank that has impeded her professional work at VCU, and damaged her professional reputation.

158.    Upon information and belief, defendants have further retaliated against Dr. Soliman by giving false and defamatory information to employers to which Dr. Soliman applied, thereby leading these employers to reject Dr. Soliman for jobs for which she applied.

159.    Defendants also provided false and defamatory information to the Massachusetts licensing authorities, which lead them to delay them granting a medical license to Dr. Soliman, which damaged her professional advancement, and ability to obtain a job in Massachusetts.

160.    Defendants' retaliatory acts failed to comply with their own internal procedures.

161.    Defendants' retaliation against Dr. Soliman culminated with a false report to the NPDB that she had resigned her privileges while under investigation.

162.    Defendants' actions constitute unlawful retaliation in violation of Title VII and the DCHRA.

163.    Defendants' retaliatory actions caused Dr. Soliman substantial pain and suffering, emotional distress and humiliation.

164.    Defendants' retaliatory actions directly and proximately caused Dr. Soliman loss of income and other economic benefits, job search costs, the loss of future employment opportunities, impairment of her future earning capacity, and damage to her professional

reputation.

COUNT FOUR
AIDING AND ABETTING IN VIOLATION OF
THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT
AGAINST DEFENDANTS UHSDC, DHP, MICHAEL BERRIGAN, RICHARD
BECKER, JASON SANKAR,
PAUL DANGERFIELD AND RONALD GURITZKY

165.     Plaintiff incorporates, as though restated here, the allegations in paragraphs 1 through 157 above.

166.     Defendants UHSDC, DHP, Berrigan, Becker, Sankar, Dangerfield and Guritzky aided and abetted Defendants GWU and MFA in discriminating and retaliating against Dr. Soliman based on her gender, and for her assertion of her own rights, as described above.

167.     Each defendant took the actions described above intentionally, maliciously, in bad faith, and with the intention to harm Dr. Soliman and drive her out of her job and prevent her from finding future employment.

168.     Defendants' actions described above in detail directly and proximately caused Dr. Soliman loss of income and other economic benefits, job search costs, loss of future employment opportunities, impairment of her future earning capacity, and damage to her professional reputation.

REQUESTED RELIEF

WHEREFORE, plaintiff respectfully prays this court for the following relief:

1.  Award backpay in an amount to be determined;

2.  Award frontpay in an amount to be determined;

3.  Award compensatory damages to plaintiff in an amount to be determined, but in no event less than $1,000,000;

34

4.   Award punitive damages to plaintiff in an amount to be determined, but in no event less than $1,000,000;

5.   Award plaintiff reasonable attorneys' fees and costs;

6.   Order defendants to withdraw these false and defamatory reports to the National Practioners Data Bank; and

Order such other relief as this court deems just and proper.

Respectfully submitted,


_____/s/_____
Lynne Bernabei, Esq. (D.C. Bar # 938936)
David Wachtel, Esq. (D.C. Bar # 427890)
Emily Read, Esq. (D.C. Bar # 492773)
Bernabei & Wachtel, PLLC
1775 T Street, N.W.
Washington, D.C. 20009
(202) 745-1942

Attorneys for Dr. Dina Soliman

DATED:   August 13, 2008