**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |  |
|---|---|---|
| DINA SOLIMAN, M.D. | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No.1:08-cv-01137 (RJL) |
| | ) | |
| THE GEORGE WASHINGTON | ) | |
| UNIVERSITY, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |

_____)

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION**
**TO DEFENDANT GEORGE WASHINGTON UNIVERSITY'S MOTION FOR PARTIAL**
**DISMISSAL OF PLAINTIFF'S COMPLAINT**

Plaintiff Dina Soliman, M.D., through undersigned counsel, respectfully submits her

Memorandum of Points and Authorities in Opposition to Defendant George Washington

University's Motion for Partial Dismissal of Plaintiff's Complaint (August 6, 2008) (Doc. No.

13) ("Def. Mot."). This is an action for egregious sex discrimination and retaliation in violation

of Title VII and the District of Columbia Human Rights Act ("DCHRA"), D.C. Code Ann. § 2-

1402.62, and for interference with business relations.

This Court should deny Defendant George Washington University's ("GWU") Motion to

Dismiss because the continuing violations doctrine applies to plaintiff's Title VII claims, and

under Section 2-1403.16 of the District of Columbia Code, as amended, plaintiff's DCHRA

claim was timely filed, since the one year statute of limitations was tolled while her complaint

was pending.

**I.    FACTUAL BACKGROUND.**

Dr. Soliman began working for defendants George Washington University ("GWU") and

Medical Faculty Associates, Inc. ("MFA") as a cardiothoracic anesthesiologist and as an Assistant Professor in the Department of Anesthesia and Critical Medical Care Medicine in August 1998.  Amended Complaint ("Am. Compl.") ¶ 16.  Defendants GWU and UHS of D.C., Inc. ("UHSDC") are the partners in defendant District Hospital Partners, LP ("DHP"), the partnership that owns and operates the George Washington University Hospital ("the Hospital"). Id. ¶¶ 5, 7-8.  Beginning in 2000, Dr. Soliman became the victim of a campaign of gender discrimination by officers and employees of defendants GWU, DHP, UHS, and MFA, through discriminatory scheduling, advancement, wages, and lab assignments.  For example, defendants GWU, DHP, UHS and MFA permitted far less qualified male doctors, including Dr. Guritzky, who at the time was not board certified because he had repeatedly failed the anesthesia board exam, to have prominent administrative positions that came with higher salaries.  Id. at ¶¶ 40, 42-43.

After enduring nearly five years of discrimination, Dr. Soliman retained counsel and reported the discrimination by defendants GWU, DHP, UHS and MFA to defendants GWU's and MFA's in-house counsels.  ¶ 52.  Despite her complaints, defendants' abuse and retaliation escalated.  Id. at ¶ 53.  On February 6, 2006, Dr. Soliman again approached defendant GWU's counsel and reported, among other things, that defendants had given her inaccurate and discriminatory performance evaluations.  Id. at ¶ 66.  Defendants did nothing to correct or stop the ongoing discrimination and retaliation against Dr. Soliman, and the hostility against her by defendants continued to escalate.  Indeed, just months later, defendants again gave her an inaccurate and discriminatory performance evaluation.  This time, her signature had been removed from the evaluation she had reviewed and signed, and had been improperly attached to a blank report, which reflected poorly on Dr. Soliman and was plainly false.  Id.

In August, 2006, Dr. Soliman applied for a position at the Holy Cross Hospital in Maryland. Upon information and belief, defendants deliberately and maliciously made false and inaccurate statements to this potential employer, causing Holy Cross to deny Dr. Soliman the position. Id. at ¶ 75. In October 2006, Dr. Soliman applied for a position at the New England Medical Center in Boston. Id. at ¶ 88. Defendants sent a negative evaluation of Dr. Soliman to the Massachusetts licensing authorities, which caused Dr. Soliman to forego seeking a license in Massachusetts, which in turn caused the New England Medical Center to reject Dr. Soliman's application. Id. at ¶ 89.

On September 4, 2006, Dr. Soliman was the attending anesthesiologist for a surgery on an obese patient, who subsequently went into cardiac arrest and died. Id. at ¶ 76. The patient's surgery was successful despite the staff's difficulty in establishing reliable blood pressure measurements. The patient died after leaving the operating room and after she was no longer under Dr. Soliman's care. Id.

Based on a false report from defendants Berrigan and Guritzky about Dr. Soliman's care of this patient, Dr. Silva, who is defendants' Medical Director, summarily suspended Dr. Soliman's Medical Staff Membership and clinical privileges, alleging she was the cause of the patient's death. Id. at ¶ 78. In violation of the Bylaws of the Medical and Dental Staff of the George Washington University Hospital ("Bylaws"), which were created and ratified by defendants, and in an effort to drive Dr. Soliman out of her job, defendants did not provide Dr. Soliman with a formal recorded hearing, the right to a legal advisor, the right to formally testify on her own behalf, or the opportunity to present witnesses and documentary evidence to defend herself against defendants' summary suspension of her privileges. Id. at ¶¶ 79-84.

Each defendant, including defendant GWU, is clearly implicated in this deliberate failure

to follow the Bylaws, which are binding on the defendants, and which purport to provide physicians with due process protections when a summary suspension or similar action is taken against them.

In September 2006, defendants unanimously reinstated Dr. Soliman's privileges, but conditioned the reinstatement on an "internal confidential peer review" of Dr. Soliman's charts. Am. Compl. at ¶ 86. Defendants' Bylaws and other policies and procedures do not, in fact, allow for such continued monitoring. Upon information and belief, defendants subjected Dr. Soliman to continued monitoring in order to retaliate against her and drive her out of her job. The monitoring also had the effect of further denying Dr. Soliman the due process protections she was entitled to as defendants' employee, because the Bylaws did not contemplate such a punishment, and therefore did not provide for an opportunity to appeal the decision. Id. at ¶ 88.

Defendants appointed defendant Guritzky to conduct the "internal confidential peer review." Id. at ¶ 93. Defendant Guritzky, as Dr. Soliman had previously reported to defendants' counsel, had constantly discriminated and retaliated against her; indeed, defendant Guritzky, along with defendant Berrigan, had made the original false complaint about Dr. Soliman that led to the summary suspension and conditional reinstatement. Dr. Soliman protested Dr. Guritzky's role in the peer review, knowing his review would be biased. See id. at ¶ 94. Defendants GWU, DHP, UHS and MFA refused to remove defendant Guritzky, and he submitted a biased and false report about Dr. Soliman's patient care. Id.

In February 2007, defendants pursued a further unwarranted peer review of Dr. Soliman as part of their continued retaliation against her, even though there was no procedural basis for such review. Id. at ¶ 111. This subsequent report contained the same falsehoods as did defendant Guritzky's report. Id. at ¶¶ 112-114. Dr. Fazy Estafanous, Chairman of the Division

of Anesthesiology, Critical Care Medicine & Comprehensive Pain Management at the Cleveland Clinic, independently reviewed the cases at Dr. Soliman's request, and reported to defendants that defendants' reports were false and biased.  Id.  Dr. Estafanous found that Dr. Soliman had safely managed the cases, and that she had at no time jeopardized any patient.  Id. at ¶ 114.

On January 26, 2007, Dr. Soliman resigned her faculty position at GWU and took a position with Virginia Commonwealth University ("VCU").  When Dr. Soliman resigned, defendants falsely and maliciously notified the National Practitioner Databank ("NPDB") that she had resigned her privileges "while under investigation."  Id. at ¶ 105.  In fact, she had not resigned her privileges; instead, she became ineligible for them through resigning from her faculty position.  Id. at ¶ 106.

Defendants' false report to the NPDB not only greatly harmed Dr. Soliman's professional reputation, but also precluded her from starting her work at VCU until May 14, 2007, and even then she could only get temporary privileges for six months.  Id. at ¶¶ 108-109.

## II.    STANDARD OF REVIEW.

A motion to dismiss for failure to state a claim upon which relief can be granted is viewed with disfavor and is rarely granted.  Doe v. United States Dep't of Justice, 753 F.2d 1092, 1102 (D.C. Cir. 1985).  On a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court accepts as true all of the factual allegations in the complaint.  Erickson v. Pardus, 551 U.S. __, 127 S. Ct. 2197, 2200 (2007) (*per curiam*); Bell Atlantic Corp. v. Twombly, 550 U.S. __, 127 S. Ct. 1955, 1964-65 (2007).  The court construes the complaint liberally in the plaintiff's favor and grants the plaintiff the benefit of all inferences that can be derived from the facts alleged.  Kowal v. MCI Communications Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994); see also Browning v. Clinton, 292 F.3d 235, 242 (D.C. Cir. 2002); Sparrow v. United

Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000).  Any ambiguities or doubts concerning

the sufficiency of the claim must be resolved in favor of the Plaintiff.  Doe, 753 F.2d at 1102.

There is no probability of success requirement at the pleading stage.  Bell Atlantic Corp., 127 S.

Ct. at 1965, but "something beyond ... mere possibility ... must be alleged[.]"  Id. at 1966.  The

facts alleged in the complaint merely "must be enough to raise a right to relief above the

speculative level," id. at 1965, or sufficient "to state a claim for relief that is plausible on its

face."  Id. at 1974.

## III.    **LEGAL ARGUMENT.**

### A.  **Plaintiff's allegations that defendants subjected her to a hostile work environment are timely under the continuing violations doctrine.**

Plaintiff has alleged that defendants' repeated discrimination constituted a hostile work

environment.[1]  The Supreme Court in National Railroad Passenger Corp. v. Morgan, held that

the continuing violations theory is applicable to hostile work environment claims because such

an environment "cannot be said to occur on any particular day.  It occurs over a series of days or

perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be

actionable on its own."  536 U.S. 101, 115 (2002) (citing Harris v. Forklift Systems, Inc., 510

U.S. 17, 21 (1993)).  "Hostile environment claims," the Court continued, "are different in kind

from discrete acts" because "[t]heir very nature involves repeated conduct."  Id.

Accordingly, under Morgan, hostile work environment claims are subject to a special

limitations rule:  "Provided that an act contributing to the claim occurs within the filing period,

the entire time period of the hostile environment may be considered by a court for the purposes

---

[1]  In evaluating whether a plaintiff has made a hostile work environment claim, a court must consider "'all the circumstances,' including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'"  Faragher v. City of Boca Raton, 524 U.S. 775, 787-88 (1998) (quoting Harris, 510 U.S. at 23 (quotation marks and citations omitted).  Here, as detailed further in Section I.A., supra, plaintiff's allegations plainly support a hostile work environment claim.

of determining liability.... In order for the charge to be timely, the employee need only file a charge within ... 300 days of any act that is part of the hostile work environment." Morgan, 536 at 117-18; see also Vickers v. Powell, 493 F.3d 186, 198 (D.C. Cir. 2007) ("so long as at least one of the acts that contributed to the hostile environment occurs within the filing period, other acts that also contributed to the claim but that did not occur within the filing period may also be considered").

The continuing violations theory applies when the plaintiff is subjected to an unlawful employment practice or practices continuing over time, so that a single act occurring within the limitations period is enough to make "'the entire time period'" count "'for the purposes of determining liability.'" Morgan, 536 U.S. at 117. The claim's "very nature involves repeated conduct," and it is based on the "cumulative effect of individual acts." Id. at 115.

The key factors for determining whether particular acts constitute a hostile work environment claim are, "whether the acts about which an employee complains are part of the same actionable hostile work environment practice, and if so, whether any act falls within the statutory [filing] time period." Morgan, 536 U.S. at 120. In Morgan, the Court analyzed whether the conduct alleged "involve[d] the same type of employment actions, occurred relatively frequently, and were perpetrated by the same managers." Id. at 120 (internal quotation marks and citation omitted).

Here, defendants, including defendant GWU, began subjecting Dr. Soliman to a hostile work environment early in her tenure with GWU. Beginning in or about August 1999, defendants Dangerfield and Sankar, who were responsible for scheduling anesthesiologists, routinely assigned Dr. Soliman to perform electroconvulsive therapy alone and to work alone in the electrophysiology ("EP") lab for long hours without breaks, much more often than they

assigned her male colleagues to such tasks.  Am. Compl. ¶ 24.  Beginning in or about August 1999, defendants Dangerfield and Sankar rarely scheduled Dr. Soliman to teach or work with residents, while they regularly scheduled her male colleagues to teach or work with residents.  Am. Compl. ¶ 25.  Throughout Dr. Soliman's tenure, defendants continued to limit her professional opportunities by denying her the opportunity to work with residents and assigning her to long hours alone in the EP lab.  Am. Compl. ¶ 29.  This campaign of discrimination "involve[d] the same type of employment actions, occurred relatively frequently, and [was] perpetrated by the same managers."  Morgan, 536 U.S. at 120 (internal quotation marks and citation omitted).

Similarly, starting in 2001, Dr. Soliman's male colleagues, including defendants Sankar and Dangerfield, subjected her to criticisms and intimidation, which "involve[d] the same type of employment actions, occurred relatively frequently, and were perpetrated by the same managers."  Morgan, 536 U.S. at 120 (internal quotation marks and citation omitted).  Defendants unfairly criticized Dr. Soliman's work in front of her colleagues, and spoke to her in a threatening and abusive manner.  See, e.g., Am. Compl. ¶ 47, 68.  Defendants Sankar and Berrigan spread false and sexist rumors about her to destroy her reputation.  Id. ¶¶ 22, 26.  Beginning in or about 2002, defendants Sankar and Dangerfield told other physicians that Dr. Soliman was incompetent, were hostile toward her when they were working together, and repeatedly questioned Dr. Soliman's judgment during surgeries in a public and abusive manner.  Defendants' actions were intended to discredit Dr. Soliman in front of her colleagues, residents, and Hospital staff.  Am. Compl. ¶ 34.

Beginning in or about 2003, defendant Berrigan began to give Dr. Soliman's male colleagues, many of whom had less experience than she did, administrative positions that came

with significantly higher salaries. Am. Compl. ¶ 40. A reasonable inference can be made that these discriminatory promotion and pay practices continued throughout Dr. Soliman's tenure, and as the plaintiff, Dr. Soliman is entitled to all inferences that can be drawn from the complaint. These discriminatory promotion and pay practices "involve[d] the same type of employment actions, occurred relatively frequently, and were perpetrated by the same managers." Morgan, 536 U.S. at 120 (internal quotation marks and citation omitted).

Beginning in August 2006, defendants falsely criticized Dr. Soliman in an effort to discredit her applications for other jobs. In August 2006, defendants made false statements about Dr. Soliman to officials at Holy Cross Hospital in Silver Spring, Maryland. Am. Compl. ¶ 75. In October 2006, defendants made similar statements to officials at New England Medical Center. Am. Compl. ¶ 95. In December 2006, defendants made false statements to officials at the Massachusetts medical licensing agency. Finally, in the spring of 2007, defendants made false statements to officials at Virginia Commonwealth University, causing a delay in Dr. Soliman receiving privileges at that institution. An inference can reasonably be drawn that this conduct "involve[d] the same type of employment actions, occurred relatively frequently, and [was] perpetrated by the same managers." Morgan, 536 U.S. at 120 (internal quotation marks and citation omitted).

Finally, defendants subjected Dr. Soliman to an ongoing discriminatory investigation and peer review process, starting on September 12, 2006. This discriminatory investigation and peer review process continued until Dr. Soliman was finally driven out of her position, in January 2007. Again, this conduct "involve[d] the same type of employment actions, occurred relatively frequently, and [was] perpetrated by the same managers." Id. at 120 (internal quotation marks and citation omitted).

Therefore, any one of defendant GWU's numerous discriminatory and retaliatory acts occurring after November 10, 2007 is enough to make "the entire time period of the hostile environment" count "for the purposes of determining liability." Morgan, 536 U.S. at 117.

**B. Defendants' remaining acts of discrimination and retaliation, even if time-barred, constitute background evidence that support plaintiff's remaining claims.**

Dr. Soliman has pled two types of discriminatory acts for which no acts took place after November 10, 2006. First, she has alleged that defendants waged a campaign to keep her off the Heart Team, both by removing her from the heart team, and then by spreading false rumors to keep her off the Heart Team. See, e.g., Am. Compl. ¶¶ 19, 23. Second, defendants gave Dr. Soliman false and discriminatory performance evaluations. Id. at ¶¶ 72-74. Although these claims are time-barred, they nevertheless constitute background evidence in support of plaintiff's hostile work environment, discrimination and retaliation claims against defendants.

**C. Dr. Soliman timely filed her DCHRA claims in this Court.**

Plaintiff's charge of discrimination, which she filed with the Equal Employment Opportunity Commission and cross-filed with the DCOHR on September 6, 2007, tolled the running of the statute of limitations on her allegations of discrimination in violation of the DCHRA that occurred within the year prior to date she filed the charge. On March 17, 2008, plaintiff requested that the EEOC issue a Notice of Right to Sue, pursuant to 29 C.F.R. § 1601.28(a). The statute of limitations began to run again when plaintiff received the EEOC's Notice of Right to Sue on April 3, 2008. She filed suit on June 30, 2008, within 90 days of the date she received the EEOC's Right to Sue Notice.

Plaintiff's complaint therefore incorporates all of the defendants' numerous discriminatory and retaliatory acts after September 6, 2006. Earlier discriminatory and

retaliatory acts are also within the scope of this lawsuit because the continuing violations

doctrine applies to plaintiff's claims.  See Morgan, 536 U.S. at 117.  As described above, under

Morgan, the continuing violations theory applies when the defendants' unlawful conduct "is

composed of a series of separate acts that collectively constitute one 'unlawful employment

practice.'"  Id. at 117.  The D.C. Court of Appeals adopted the Morgan continuing violations

analysis in Lively v. Flexible Packaging Ass'n, 830 A.2d 874 (D.C. 2003) (en banc), which also

construed the D.C. Human Rights Act.  The Lively Court concluded that the continuing

violations theory applies when the plaintiff is subjected to "one unlawful employment practice"

continuing over time, id. at 890, and that a single act occurring within the limitations period is

enough to make "'the entire time period'" count "'for the purposes of determining liability.'"  Id.

(quoting Morgan, 536 U.S. at 117).

     Here, Defendants' sexual harassment campaign began in 2000 and ended when

defendants made their false report to the NPDB, after plaintiff had resigned her position.

Therefore, any one of the Defendants' numerous harassing and retaliatory acts occurring after

January 1, 2000 is enough to make "'the entire time period of the hostile environment'" count

"'for the purposes of determining liability.'"  Id.; see also Section I.A., supra.

### 1.  The DCHRA provides for tolling during the administrative process.

     From its inception until 1997, the DCHRA provided a one year statute of limitations.

Employees could file administrative charges, but filing an administrative charge had no effect on

the statute of limitations for a civil action.  See Historical and Statutory Notes to D.C. Code § 2-

1403.16 (formerly cited as D.C. Code 1981 § 1-2556 (1981 ed.)).

     In the Human Rights Amendment Act of 1997 (Act 12-143), the D.C. Council amended

the DCHRA to add a tolling provision during the DCOHR administrative process.  In 2002, that

provision was further amended to provide for tolling during *any* administrative process, whether

before DCOHR or EEOC.  The private right of action provision now states, in relevant part, that:

> A private cause of action pursuant to this act shall be filed in a court of
> competent jurisdiction within 1 year of the unlawful discriminatory
> practice, or the discovery thereof  . . . The timely filing of a complaint
> with the Office… **shall toll the running of the statute of limitations
> while the complaint is pending**.

D.C. Code § 2-1403.16(a) (formerly codified as D.C. Code 1981 § 1-2556(a) (1981 ed.))

(emphasis added).  Therefore, plaintiff's charge of discrimination with the EEOC tolled the

statute of limitations on all of her allegations of discrimination that occurred within the year prior

to date she filed the charge.

In two cases analyzing this issue, courts have mistakenly relied on pre-1997 precedent to

incorrectly hold that the DCHRA statute of limitations was not tolled during the administrative

process.  See Kamen v. Int'l Bhd of Elec. Workers, 505 F. Supp. 2d 66 (D.D.C. 2007) (RMC)

and Coleman v. Potomac Electric Power Co., 2004 WL 2348144 (D.C. Cir. 2004) affirming 310

F. Supp. 2d 154 (D.D.C. 2004) (RMC).  Coleman is an unreported summary affirmance.

Plaintiff Coleman was pro se in this Court and in the D.C. Circuit.  Coleman v. Potomac Electric

Power Co., Civ. Act. No. 1:03CV01202 (D.D.C.).  Coleman has been cited for this point exactly

once, in Kamen.  505 F. Supp. 2d at 76.

The unambiguous language of the DCHRA is clear, and courts have repeatedly held that

the DCHRA's statute of limitations is tolled during the pendency of a claim before an

administrative agency.  See generally Aigret v. Compass Group North America, Inc., C.A. No.

01-CA-1650 (D.D.C. April 15, 2004) (attached hereto as Exhibit A); Estenos v. PAHO/WHO

Federal Credit Union, 131 Daily Wash. L. Rptr. 537 (D.C. Super. Ct. Mar. 19, 2003) (attached

hereto as Exhibit B).

2.  **Voluntary withdrawal of a complaint does not eviscerate the protection of tolling.**

Once filed, a charge of discrimination can end in one of three ways: (1) the employee can withdraw the complaint; (2) the EEOC or DCOHR can dismiss the complaint for administrative convenience; or (3) the EEOC or DCOHR can reach a conclusion on the merits of the complaint. D.C. Code § 2-1403.16(a). If the EEOC of DCOHR reaches a conclusion on the merits, the employee can appeal the decision, but cannot obtain a trial de novo, which is the situation here. See, e.g., D.C. Code § 2-1403.14 (authorizing judicial review of DCOHR decisions in accordance with D.C. Code § 2-510(a): "The Court shall hear and determine all appeals upon the exclusive record for decision before the Mayor or the agency."). However, if the complaint is terminated in either the first or second ways, the employee is entitled to trial de novo. D.C. Code § 2-1403.16(a) ("where the [DCOHR] has dismissed such complaint on the grounds of administrative convenience, or where the complainant has withdrawn a complaint, such person shall maintain all rights to bring suit as if no complaint had been filed.").

The District of Columbia courts have repeatedly held that a plaintiff may elect to bring her DCHRA claim in court once the EEOC or DCOHR has dismissed it on grounds of administrative convenience *or* the plaintiff has withdrawn her complaint from the EEOC or DCOHR, as plaintiff did here when she requested a Notice of Right to Sue. See, e.g., Kensil v. Union Labor Life Insurance Co., C.A. No. 05-CA-7313, at 3 (D.C. Super. Ct. July 31, 2006); Adams v. Howard University, C.A. No. 00-CA-7610 (D.C. Super. Ct. April 27, 2004) (DCHRA statute of limitations tolled while "complaint is pending before the EEOC"); Aigret, C.A. No. 01-CA-1650 (Exhibit A); Vitikacs v. The American Legion, 2003 WL 22004935 *3, n. 2 (D.C. Super. Ct. June 8, 2003); Estenos, 131 Daily Wash. L. Rptr. 537 (Exhibit B).

13

Employees were entitled to trial <u>de</u> <u>novo</u> even before the 1997 amendments to the DCHRA, and remain entitled to such a trial now.  <u>See</u>, <u>e.g.</u>, <u>Parker v. National Corp. for Housing Partnerships</u>, 697 F. Supp. 5 (D.D.C. 1988) (aggrieved party who has filed complaint with DCOHR may file complaint in a court of competent jurisdiction only when DCOHR dismisses complaint on ground of administrative convenience or when complainant withdraws complaint before DCOHR renders administrative decision); <u>Held v. National R.R. Passenger Corp.</u>, 101 F.R.D. 420 (D.D.C. 1984) (where employee withdrew discrimination complaint which he had filed with the DCOHR, he was entitled to maintain judicial action); <u>Brown v. Capitol Hill Club</u>, 425 A.2d 1309 (D.C. 1981) (where DCOHR dismisses a complaint on grounds of administrative convenience, or where the complainant withdraws his complaint before an administrative decision is rendered, such person retains the right to file a complaint in court).

### 3. Rules of statutory construction also favor allowing plaintiff's DCHRA claims to go forward.

The meaning of the DCHRA's tolling provision and entitlement to trial <u>de</u> <u>novo</u> is clear. But to the extent that the DCHRA's meaning is even arguably ambiguous, this Court should follow the rules of statutory construction providing that, "[w]here two constructions as to the limitations period are possible, the courts prefer the one that gives the longer period in which to prosecute the action… 'If there is any reasonable doubt in a statute of limitations problem, the court will resolve the question in favor of the complaint standing and against the challenge.'" <u>Lively</u>, 830 A.2d at 877 (quoting <u>Simpson v. D.C. Office of Human Rights</u>, 597 A.2d 392, 401 (D.C. 1991)).  District of Columbia courts adopt a construction that favors the complaining party in order to reflect the importance of the civil rights secured by the DCHRA, and the importance of a private suit in helping to fulfill the Act's commitment to civil rights.  <u>See</u> <u>Simpson</u>, 597 A.2d at 402; <u>see</u> <u>also</u> <u>Executive Sandwich Shoppe, Inc. v. Carr Realty Corp.</u>, 749 A.2d 724, 731

(D.C. 2000) ("[w]e have specifically stated on several occasions that the DCHRA is a remedial civil rights statute that must be generously construed.").  Thus, if this court were to find any ambiguity in the DCHRA's tolling provision and right to trial de novo, it should still construe this provision in plaintiff's favor and find that her DCHRA claims were timely filed.

### IV.    CONCLUSION.

For the reasons stated above, Plaintiff respectfully requests that this Court deny Defendant George Washington University's Motion for Partial Dismissal because the continuing violations theory applies to plaintiff's claims, and under DCHRA Section 2-1403.16, plaintiff's DCHRA claim was timely filed, since the one year statute of limitations was tolled while her complaint was pending.

Respectfully submitted,

_____/s/_____
Lynne Bernabei, Esq. (D.C. Bar # 938936)
David Wachtel, Esq. (D.C. Bar # 427890)
Emily Read, Esq. (D.C. Bar # 492773)
Bernabei & Wachtel, PLLC
1775 T Street, N.W.
Washington, D.C. 20009
(202) 745-1942
(202) 745-2627 fax
Attorneys for Dr. Dina Soliman

DATED:   August 20, 2008

# Exhibit A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                              )
YVES AIGRET,                  )
                              )
          Plaintiff,          )
                              )
     v.                       )          Civil Action No. 01-1650 (RWR)
                              )
COMPASS GROUP NORTH           )
     AMERICA, INC., et al.,   )
                              )
          Defendants.         )
_____)

**MEMORANDUM OPINION AND ORDER**

Plaintiff Yves Aigret filed an action against defendants
Compass Group North America, Inc., Eurest Food Service and
Compass Group USA, Inc., claiming that defendants violated the
federal Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601,
et seq. (1998), and discriminated against him on the basis of his
age in violation of the District of Columbia Human Rights Act
("DCHRA"), D.C. Code Ann. § 1-2512 (1981).[1]  Defendants have
moved to dismiss or, in the alternative, for summary judgment on
plaintiff's DCHRA age discrimination claim, arguing that the
DCHRA claim is barred by the statute's one year limitations
period.  In opposition, plaintiff argues that his DCHRA claim was
timely filed in this court because his charge of discrimination,
which was cross-filed with the District of Columbia Office of

_____

[1]    Section 1-2512 was recodified, without material change, at
D.C. Code Ann. § 2-1402.11 (2001).

- 2 -

Human Rights ("DCOHR") when he filed his charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), remained pending before the DCOHR when he filed this lawsuit, thus tolling the DCHRA's one year statute of limitations. Because plaintiff's charge of discrimination with the DCOHR remained pending at the time he filed his complaint in this court, and plaintiff has not established that he withdrew his charge of discrimination from the DCOHR before filing suit, his DCHRA age discrimination claim will be dismissed without prejudice because the court lacks subject matter jurisdiction over DCHRA claims that remain pending with the DCOHR.

<u>BACKGROUND</u>

Plaintiff Yves Aigret filed a charge of discrimination with the EEOC on November 9, 1999, alleging a violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621, <u>et</u> <u>seq.</u> (1994). Plaintiff cross-filed his charge of discrimination with the DCOHR. (<u>See</u> Pl.'s Mem. P. & A. in Opp'n Mot. to Dismiss or, in Alt. Summ. J. ("Pl.'s Opp'n") at Ex. 1 (Declaration of Yves Aigret ("Aigret Decl.")) at Att. 1 (EEOC Form 5); Defs.' Mem. in Supp. Mot. to Dismiss or, in Alt. Summ. J. ("Defs.' Mot.") at 2.) The DCOHR notified the EEOC on December 20, 1999 that, "[p]ursuant to the worksharing agreement, [plaintiff's] charge [was] to be initially investigated by the

- 3 -

EEOC." (Aigret Decl. at Att. 5 (EEOC Form 212).)  In its

notification to the EEOC, the DCOHR checked the box on EEOC

Form 212 which acknowledged receipt of plaintiff's charge and

also indicated to the EEOC that the DCOHR did not intend "to

initially investigate the charge." (Id.)  The DCOHR did not

check the box on EEOC Form 212 to indicate that the agency was

dismissing, closing or not docketing plaintiff's age

discrimination charge.  (See id.)

On March 5, 2001, the EEOC issued plaintiff a "Dismissal and

Notice of Rights," informing plaintiff that the EEOC was closing

its file on his charge of discrimination filed with the EEOC.[2]

(See id. at Att.4 (EEOC Form 161).)  Plaintiff filed this lawsuit

on July 30, 2001, claiming that defendants violated the FMLA[3]

when they eliminated his position while he was out on short term

medical leave from May 7 to August 2, 1999, and discriminated

---

[2]    The March 5, 2001 notice was the second dismissal and notice
of rights received by plaintiff.  The EEOC originally issued to
plaintiff a dismissal and notice of rights dated March 2, 2000,
but sometime thereafter revoked and vacated that dismissal.  (See
Aigret Decl. at Att. 2 (EEOC Form 161) and Att. 3 (Fernandez
Ltr.); Pl.'s Opp'n at 2 n.1.)

[3]    Plaintiff's original complaint also asserted a claim under
the District of Columbia Family and Medical Leave Act ("DCFMLA"),
D.C. Code Ann. § 36-1301, et seq. (1981), which defendants also
moved to dismiss asserting that the DCFMLA's one year statute of
limitations barred such a claim.  (See Defs.' Mot. at 5.)
Conceding that argument (see Pl.'s Opp'n at 8), plaintiff amended
his complaint to eliminate the DCFMLA claim.

- 4 -

against him on the basis of his age in violation of the DCHRA
when they offered him in August 1999 the choice of a job
termination or a demotion.

DISCUSSION

Before a court may address the merits of a complaint, it
must be assured that it has the authority to exercise
jurisdiction over the claims. See Scott v. England, 264 F. Supp.
2d 5, 8 (D.D.C. 2002) (citing Steel Co. v. Citizens for a Better
Env't, 523 U.S. 83, 94-95 (1998)). "[A] federal court, whether
trial or appellate, has a duty to notice a failure of subject-
matter jurisdiction on its own motion at any time during the
proceedings," Nichols v. Agency for Int'l Dev., 18 F. Supp 2d 1,
3 (D.D.C. 1998) (citing Potomac Passengers Ass'n v. Chesapeak &
O. Ry., 520 F.2d 91 (D.C. Cir. 1975)), and if the court concludes
that it does not have jurisdiction over certain claims, those
claims must be dismissed. See Fed. R. Civ. P. 12(h)(3); National
Parks Conservation Ass'n v. Norton, 324 F.3d 1229, 1240 (11th
Cir. 2003) (relying on Rule 12(h)(3) in remanding case to the
district court for dismissal of claims over which the district
court lacked subject matter jurisdiction); cf. Allen v. Rehman,
132 F. Supp. 2d. 27, 29 (D.D.C. 2000) ("[A] court must dismiss a
case sua sponte at any time if it concludes that it lacks
jurisdiction over the case."); Bogush v. Passiac Police Dept.,

- 5 -

1989 WL 10604, No. 89-0233, *1 (D.D.C. Jan. 31, 1989) ("[I]f the Court concludes *sua sponte* that it does not have jurisdiction over [a] lawsuit, . . . the case must be dismissed."). Because subject-matter jurisdiction focuses on the court's authority to hear a claim, a court must "conduct a careful inquiry and make a conclusive determination whether it has subject matter jurisdiction or not," 5A Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure: Civil 2d ("Wright & Miller") § 1350 (1990), by examining the complaint and, "where necessary, . . . [by] consider[ing] the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." Coalition for Underground Expansion v. Mineta, 333 F.3d 193, 198 (D.C. Cir. 2003).

   In August 1999, the DCHRA provided, in relevant part, that "[a]ny person claiming to be aggrieved by an unlawful discriminatory practice shall have a cause of action in any court of competent jurisdiction for damages and such other remedies as may be appropriate, unless such person has filed a complaint hereunder[.]" D.C. Code Ann. § 1-2556(a).[4] The DCHRA "does not require exhaustion of administrative remedies before pursuit of a

---

[4]   Section 1-2556(a) was recodified, without material change, at D.C. Code Ann. § 2-1403.16(a) (2001).

- 6 -

judicial remedy, but instead 'provides for an *ab initio* election
of remedies.'" <u>Weiss v. International Brotherhood of Elec.
Workers</u>, 729 F. Supp. 144, 146 (D.D.C. 1990) (quoting <u>Anderson v.
United States Safe Deposit Co.</u>, 552 A.2d 859, 863 (D.C. 1989)).
"[W]ith certain provisos, the jurisdiction of the [DCOHR] and
this Court are mutually exclusive and a plaintiff must elect
between the filing of a Human Rights Act complaint with the
[DCOHR] and this Court." <u>Hoque v. Roach</u>, 967 F. Supp. 7, 9-10
(D.D.C. 1997); <u>see</u> <u>Weiss</u>, 729 F. Supp. at 146 ("[A] claimant who
files a claim with the [DCOHR] may still file a lawsuit, but only
if the administrative claim is withdrawn prior to the completion
of the [DCOHR's] investigation or if the DCOHR dismisses the
complaint for administrative convenience.") (citations omitted).
Where the DCOHR has dismissed a plaintiff's complaint on the
grounds of administrative convenience, or where the plaintiff has
withdrawn a complaint, the plaintiff maintains all rights to
bring suit as if no complaint had been filed. <u>See</u> D.C. Code Ann.
§ 1-2556(a).

Defendants concede that a charge of age discrimination filed
with the EEOC by a person in the District of Columbia is cross-
filed with the DCOHR pursuant to a worksharing agreement. (<u>See</u>
Defs.' Mot. at 2, 4; Aigret Decl. at Att. 1 and Att. 5.) "When a
worksharing agreement is in effect, claims received by one agency

- 7 -

'shall be deemed received by the other agency . . ..'" <u>Fowler v.</u>
<u>District of Columbia</u>, 122 F. Supp. 2d 37, 42 (D.D.C. 2000)
(quoting 29 C.F.R. § 1626.10(c) (2000)); <u>see</u> 29 C.F.R.
§ 1626.10(c)) (1999).  "Thus, by filing a claim with the EEOC,
the plaintiff commences proceedings with both the EEOC and the
designated state agency . . .." <u>Fowler</u>, 122 F. Supp. 2d at 42;
<u>see</u> <u>Vitikacs v. The American Legion</u>, No. 02-CA-10202, 2003 WL
22004935, *2-3 (D.C. Super. June 8, 2003).

When plaintiff filed his November 9, 1999 charge of
discrimination with the EEOC, and indicated on EEOC Form 5 that
he wanted the "charge filed with both the EEOC and the State or
local agency" (Aigret Decl. at Att. 1), he initiated proceedings
with both the EEOC and the DCOHR.  <u>See</u> 29 C.F.R. §§ 1626.7(c)),
1626.10(c)) (1999).  Unlike the EEOC, which conducted and
completed its investigation of plaintiff's age discrimination
claim under the ADEA (<u>see</u> <u>id.</u> at Att. 4), the DCOHR decided only
that it would not initially investigate plaintiff's charge of age
discrimination.  (<u>See</u> <u>id.</u> at Att. 5.)  The DCOHR did not
determine in December 1999 that it was dismissing, closing or not
docketing plaintiff's charge of age discrimination (<u>see</u> <u>id.</u>), and
defendants offer no evidence to establish that the agency
dismissed plaintiff's charge of age discrimination for
administrative convenience or reached any conclusion on the

- 8 -

merits, whether as a result of the EEOC's investigation[5] or its

own investigation.  Moreover, plaintiff has not offered any

evidence that he withdrew his charge of age discrimination from

the DCOHR.  Because the evidentiary record reflects neither any

final agency action by the DCOHR with respect to plaintiff's

charge of age discrimination, nor plaintiff's withdrawal of his

charge from the DCHOR, plaintiff's age discrimination complaint

remains pending with the DCOHR.[6]  See Vitikacs, 2003 WL 22004935

---

[5]    Also, defendants do not offer any evidence to suggest that
the EEOC informed the DCOHR that the EEOC dismissed plaintiff's
age discrimination claim and the bases for the dismissal, or that
the DCOHR was aware that the federal agency had taken such
action.

[6]    Defendants' motion to dismiss plaintiff's age discrimination
claim as having been filed beyond the limitations period argues
that the claim did not remain pending before the DCOHR after
December 1999 because the agency did not assume jurisdiction over
plaintiff's charge by initiating an investigation.  (See Defs.'
Mot. at 4.)  To support this argument, defendants rely on the
EEOC's implementing regulations for Title VII of the Civil Rights
Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, et seq. (2000), and
for the Americans with Disabilities Act of 1990 ("ADA"), 42
U.S.C. § 12101, et seq. (2000).  (See Defs.' Mot. at 4-5 (citing
29 C.F.R. § 1601.13 (1999)).)  The EEOC's Title VII and ADA
implementing regulations contain a provision conferring a 60-day
period of exclusive jurisdiction on the local fair employment
practice agency, here the DCOHR, "to process allegations of
discrimination" under Title VII and the ADA before the EEOC "may
commence processing the allegation of discrimination."  See 29
C.F.R. § 1601.13(a)(1)(ii).  Defendants therefore argue that the
DCOHR's failure to initiate an investigation in the 60-day period
provided by § 1601.13 constituted a waiver of all jurisdiction
over plaintiff's charge of age discrimination.  (See Defs.' Mot.
at 4-5.)  Although a similar argument has been rejected by the
Superior Court of the District of Columbia as being

- 9 -

at *3 ("[N]othing in the statutory language [of the DCHRA]

suggests that a complaint cross-filed with the DCOHR should not

────────────────────

"unjustifiably inflexible and inconsistent with the [DCHRA's] statutory language and intent," Vitikacs, 2003 WL 22004935 at *3 n.2, even if true, defendants fail to explain how the Title VII and ADA implementing regulations apply to plaintiff's charge of age discrimination at issue here, which would be governed by the EEOC's implementing regulations for the ADEA.

Unlike the implementing regulations for Title VII and the ADA, the ADEA implementing regulations do not contain a 60-day exclusive jurisdiction provision.  Under the implementing regulations for the ADEA, the EEOC "may process any charge at any time, notwithstanding provisions for referral to and from appropriate State agencies."  29 C.F.R. § 1626.9.  And a complainant may file, and the EEOC may process and investigate, a charge of discrimination even if the local agency has terminated its local proceedings.  See id. at § 1626.7 ("[A charge of discrimination] shall be filed with the [EEOC] or its designated agent within . . . 300 days of the alleged discriminatory action, or 30 days after receipt of notice of termination of State proceedings, whichever is earlier.").  The plain language of the EEOC's ADEA implementing regulations make clear that the EEOC may initiate dual agency action at any time, or may conduct its own investigation, notwithstanding any action taken by a local agency.  It would be anomalous to find that, whereas the EEOC may investigate claims of discrimination arising under federal law at any time, the DCOHR may not do likewise with respect to cross-filed discrimination claims which implicate local laws.

Further, because plaintiff asserts a claim for age discrimination, and not a cause of action under Title VII or the ADA, a finding that plaintiff's age discrimination claim remained pending with the DCOHR is not inconsistent with the unpublished opinion in Griffin v. the Acacia Group, No. 97-2816, 1998 U.S. Dist. LEXIS 10854 (D.D.C. July 13, 1998), which relied on Title VII's 60-day deferral period in deciding that the plaintiff's sex discrimination claim in that case was not pending before the DCOHR after the EEOC began its investigation.  Id. at *12-13.  No such deferral period applies to age discrimination claims.  See 29 C.F.R. § 1626.9.

- 10 -

be deemed to be 'pending' before the DCOHR simply because the
EEOC takes the lead in the investigation of the complaint.
Common usage and understanding of the term 'pending' is fully
consistent with the Court's conclusion that a complaint filed
with the DCOHR remains pending before the agency until it is
withdrawn, dismissed for administrative convenience, or resolved
on the merits."). Accordingly, this court does not have subject
matter jurisdiction over plaintiff's DCHRA age discrimination
claim. Anderson, 552 A.2d at 863; Hoque, 967 F. Supp. at 9-10;
see Weiss, 729 F. Supp. at 146.

Because the court does not have subject matter jurisdiction
over plaintiff's DCHRA claim, that claim will be dismissed
without prejudice to plaintiff seeking leave when and if
appropriate to further amend his complaint to reallege his DCHRA
age discrimination claim, and to assert facts which establish its
timeliness and the existence of subject matter jurisdiction over
that claim in this court.

## CONCLUSION AND ORDER

Plaintiff's charge of age discrimination, cross-filed with
the DCOHR on November 9, 1999, remains pending with the DCOHR.
Consequently, this court is without subject matter jurisdiction
over plaintiff's DCHRA claim. Therefore, it is hereby

- 11 -

ORDERED that defendant's motion to dismiss, or in the
alternative for summary judgment [#3], be, and hereby is, GRANTED
in part.  Count I of plaintiff's amended complaint is hereby
DISMISSED without prejudice.

SIGNED this 15th day of April, 2004.


_____
RICHARD W. ROBERTS
United States District Judge

# Exhibit B

2/6

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

JUAN R. ESTENOS,

        Plaintiff,

        v.

PAHO/WHO FEDERAL
    CREDIT UNION,

        Defendant.

:
:
:
:
:
:
:
:
:
:

Civil Action No.: 01ca9125

Judge Natalia M. Combs Greene

Calendar Eleven

Next Event: None Scheduled

## <u>ORDER</u>

### I.    Introduction

    This matter is before the Court on defendant's Motion to Dismiss, filed on February 26, 2002. Defendant argues that plaintiff's claim was not brought within the proper statute of limitations. Plaintiff contends that the statute of limitations was tolled when the Equal Employment Opportunity Commission ("EEOC") cross-filed the complaint with the D.C. Office of Human Rights ("OHR"). Determining the significance of the cross-filing, therefore, is the focus of this Order. Since the timeline of events is important in this case, it shall be briefly reviewed.

    This suit arises from defendant's termination of plaintiff on August 31, 2000. On September 7, 2000, plaintiff filed a charge of discrimination with the EEOC. On September 14, 2000, the EEOC notified defendant that a charge of discrimination had been filed by plaintiff. The notification called for defendant to submit a statement outlining its position on the allegations. On September 14, 2000, the EEOC also transmitted the charge to the OHR. The transmittal indicated that "[p]ursuant to the worksharing agreement, this charge is to be initially investigated by the EEOC." (Pl.'s Opp'n, Ex. B.) On February 20, 2001, the EEOC made a

determination that "there is reasonable cause to believe that Respondent discriminated against the Charging Party because of his national origin, (Hispanic-Peruvian), and subjected him to disparate treatment, in violation of Title VII of the Civil Rights Acts of 1964…" (Pl.'s Opp'n, Ex. G.) The determination further indicated that the EEOC would "endeavor to eliminate the alleged unlawful employment practices by informal methods of conference, conciliation, and persuasion." (Pl.'s Opp'n, Ex. G.) On May 31, 2001, the EEOC forwarded a letter to both parties indicating that the informal methods of conciliation had been deemed unsuccessful. (Pl.'s Opp'n, Ex. J.) On September 14, 2001, the EEOC sent plaintiff notice of his right to sue. (Pl.'s Opp'n, Ex. K.) Plaintiff filed suit on December 14, 2001. Under Count I of his complaint, plaintiff sought recovery under the Human Rights Act for the District of Columbia, D.C. Code Ann. § 2-1401.01 *et seq*. (2002). Under Count II, plaintiff sought to recover under Title VII. (Compl.) The case was then removed to the District Court for the District of Columbia. Defendant filed a motion to dismiss on the grounds that it is not an employer under Title VII because it never employed fifteen or more employees during the period in question.[1] The District Court agreed with this argument and granted this motion.[2] The District Court then remanded Count I to this Court for resolution, finding it to be a matter of first impression.

## II.    Analysis

### A.    Applicable Statute of Limitations

Under the law of the District of Columbia, "[a]ny complaint under this chapter shall be filed with the Office within 1 year of the occurrence of the unlawful discriminatory practice, or the discovery thereof…" D.C. Code Ann. § 2-1403.04(a) (2002). The statute of limitations,

---

[1] The relevant section of Title VII defines employer as, "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year…" 42 U.S.C. §2000e.

[2] Apparently, the EEOC did not address this threshold issue in its year-long investigation.

2

therefore, provides a year for filing the complaint. Within the same section of the D.C. Code, an explanation of the filing process is provided:

> Any person or organization, whether or not an aggrieved party, may file with the Office a complaint of a violation of the provisions of this chapter, including a complaint of general discrimination, unrelated to a specific person or instance. The complaint shall state the name and address of the person alleged to have committed the violation, hereinafter called the respondent, and shall set forth the substance thereof, and such other information as may be required by the Office.

D.C. Code Ann. § 2-1403.04 (a)(2002).

**B.      Tolling of the Statute of Limitations**

Under the law of the District of Columbia, "[t]he timely filing of a complaint with the Office … shall toll the running of the statute of limitations while the complaint is pending." D.C. Code Ann. § 2-1403.16(a) (2002).

**C.      Law Applied to the Instant Case**

Defendant argues that the Court should read the language "filing of a complaint" strictly and bar plaintiff's claim. The Court finds defendant's position overly formal and inconsistent with the intent of the relevant legislative provisions.

First, it is true that the Court begins the analysis with the presumption that "[t]he words used [in the statute], even in their literal sense, are the primary, and ordinarily the most reliable, source of interpreting the meaning of any writing." *J. Parreco & Son v. District of Columbia Rental Hous. Comm'n*, 567 A.2d 43, 46 (D.C. 1989) (quoting *Cabell v. Markham*, 148 F.2d 737, 739 (2nd Cir. 1945) (per Learned Hand, J.). The law of the District of Columbia calls for a complaint to be filed with the OHR within one year of the alleged discriminatory conduct. Plaintiff filed a complaint with the EEOC. This complaint was cross-filed with the OHR. The cross-filing essentially satisfied the requirements of a complaint, under D.C. Code Ann. § 2-1403.04(a), by providing the name and address of the alleged perpetrator of the discriminatory

conduct and outlining the alleged discriminatory conduct. Defendant argues that plaintiff did not actually file a complaint with the OHR and, consequently, the Court should bar his claim as falling beyond the statute of limitations.

Complimenting the literal approach, however, is the presumption that the language of the legislation makes manifest the intent of the legislature. The procedures of the EEOC and the OHR are intended to encourage the informal resolution of discrimination complaints. *See*, e.g., 42 U.S.C. § 2000e-5(b) (2002); D.C. Code Ann. § 2-1403.06(b) (2002). Indeed, the purpose of tolling the statute of limitations is to provide the parties with the necessary time to reach an informal, nonjudicial resolution. Taking note of this fact, the Court is loath to read D.C. Code Ann. § 2-1403.16(a) in a manner that punishes plaintiff for pursuing the nonjudicial solution with the federal equivalent of the D.C. Office of Human Rights. It would certainly work an injustice if these informal procedures were to become a complicated labyrinth of obstacles whereby the legally unsophisticated party would be stripped of a remedy for failing to appreciate the nuances of the law. Indeed, it would also be antithetical to the Worksharing Agreement that the EEOC and the OHR have reduced to writing.

Under the section entitled, "Filing of Charges of Discrimination," the entities resolved that "[i]n order to facilitate the assertion of employment rights, the EEOC and the [OHR] each designate the other as its agent for the purpose of receiving and drafting charges…" (Pl.'s Opp'n, Ex. C at 1.) Further on in the agreement, the entities also agreed that "[n]otwithstanding any other provision of the Agreement, the [OHR] or the EEOC may request to be granted the right to initially process any charge." (Pl.'s Opp'n, Ex. C at 5.) As these passages should make evident, the relationship can best be described as synergistic. Each has agreed to act as the other's agent. An elaborate system of interconnectedness binds the one agency to the other in an

4

effort to increase their effectiveness. With this in mind, the Court is hesitant to view a filing with one agency as wholly unrelated and unconnected with the other, thereby effectively rewriting the Worksharing Agreement.

Moreover, the policy underlying all statutes of limitations is to ensure fairness to defendants by protecting them from "stale claims in which the defense is hampered by lost evidence, faded memories, and disappearing witnesses, and to avoid unfair surprise." *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 473 (1975) (Marshall, J., concurring in part and dissenting in part). These concerns are not present in the case at bar. Plaintiff filed his complaint with the EEOC one week after he was terminated. Defendant was made aware of the charges against it two weeks after plaintiff's termination and was called upon to investigate the charges and make its position known to the EEOC.

In sum, for the purposes of triggering the tolling provision, the Court finds that the EEOC cross-filing satisfies both the intent and the language of D.C. Code Ann. § 2-1403.16(a).

Accordingly, it is this _3rd_ day of _February_, 2003

**ORDERED** that defendant's Motion to Dismiss is hereby DENIED without prejudice.

**SO ORDERED.**

Natalia M. Combs Greene
Associate Judge

Copies to:

Mindy Gae Farber, Esq.
11300 Rockville Pike
Suite 808
Rockville, MD 20852

Kirsten Elizabeth Keating, Esq.
601 13th Street, N.W.

Suite 1000 South
Washington, D.C. 20005-3807

6