**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                              )
DINA SOLIMAN, M.D.                            )
                                              )
        Plaintiff                            )
                                              )
        v.                                   )     Civil Action No. 1:08-cv-01137 (RJL)
                                              )
THE GEORGE WASHINGTON                         )
UNIVERSITY, *et al.*                          )
                                              )
        Defendants.                         )
_____)

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION
TO DEFENDANTS MEDICAL FACULTY ASSOCIATES, DR. BERRIGAN,
DR. DANGERFIELD, DR. SANKAR AND DR. GURITZKY'S
MOTION TO DISMISS AND TO COMPEL ARBITRATION**

Plaintiff Dina Soliman, M.D., through undersigned counsel, respectfully submits her

Memorandum of Points and Authorities in Opposition to Defendants Medical Faculty

Associates, Dr. Berrigan, Dr. Dangerfield, Dr. Sankar and Dr. Guritzky's Motion to Dismiss and

to Compel Arbitration (August 8, 2008) (Doc. No. 14) ("Def. Mot."). This is an action for sex

discrimination, a sexually hostile work environment, and retaliation in violation of Title VII and

the District of Columbia Human Rights Act ("DCHRA"), D.C. Code Ann. § 2-1402.62, and for

interference with business relations.

This Court should deny defendants' Motion to Compel Arbitration because the arbitration

provision of plaintiff's employment agreement is not applicable to plaintiff's claims against these

five defendants, and because defendants Berrigan, Dangerfield, Sankar and Guritzky are not

signatories to plaintiff's employment agreement, so they lack standing to compel arbitration.

I.      **FACTUAL BACKGROUND.**

A.      **Plaintiff's Employment and Her Employment Agreement.**

Dr. Soliman became an employee of defendants George Washington University

("GWU") and Medical Faculty Associates, Inc. ("MFA"), as a cardiothoracic anesthesiologist

and as an Assistant Professor in the Department of Anesthesia and Critical Medical Care

Medicine, in August 1998.  See Amended Complaint ("Am. Compl.") ¶ 16.  Defendant MFA is a

medical practice group affiliated with defendant GWU, with its offices in defendant GWU's

Ambulatory Care Center.  Id. ¶ 6.  MFA is essentially a shell corporation in that it processes

payroll and benefits for certain GWU faculty and staff who work at the GWU Hospital, which is

itself owned by defendants GWU and UHSDC.

On June 12, 2000, plaintiff and Dr. Alan G. Wasserman, the MFA President, co-signed

the George Washington University Medical Faculty Associates Physician Agreement

("Employment Agreement") (June 12, 2000) (attached hereto as Exhibit A).  The Employment

Agreement contains an arbitration provision only applicable to disputes arising out of the

Agreement:  "The parties agree that all claims **arising under this Agreement** shall be resolved

through binding arbitration…"  See Exhibit A, Section XI (emphasis added).

The scope of plaintiff's Employment Agreement is markedly limited, and therefore

issues "arising under" the Agreement are correspondingly limited.  Pursuant to the Agreement,

plaintiff was obligated to work for defendant MFA in exchange for compensation and benefits

provided by defendant MFA.  Id., Section III, "Physician's Obligations," Section IV,

"Physician's Compensation," and Section VII, "Physician Benefits."  Plaintiff's sole additional

obligation under the Agreement was to agree not to compete with, or solicit for employment

employees of, defendant MFA for a certain time period following the termination of the contract.

Id., Section VIII, "Professional Conduct." Therefore, the scope of the Employment Agreement is limited <u>only</u> to plaintiff's and defendant MFA's performance of the provisions contained within the contract. In contrast, most aspects of Dr. Soliman's job performance, particularly her clinical privileges which are necessary for her to treat patients at the GWU Hospital, are covered by the "Bylaws of the Medical and Dental Staff of the George Washington University Hospital." <u>See</u> Am. Compl., ¶ 79. The Bylaws were created and ratified by GWU, UHSDC, and DHP, <u>id.</u>, but were not signed by MFA, which is not a party to the Bylaws.

Defendants Berrigan, Dangerfield, Sankar and Guritzky were <u>not</u> signatories to plaintiff's Employment Agreement, and indeed the Agreement plainly states that it "is an Agreement **between the George Washington University Medical Faculty Associates ("MFA") and the individual ("Physician") who has signed below**." <u>See</u> Exhibit A, Section I, "Scope and Term of Agreement" (emphasis added). Nowhere does the Employment Agreement mention defendants Berrigan, Dangerfield, Sankar or Guritzky, or state that any of its provisions, let alone its arbitration provision, binds plaintiff to arbitrate disputes with third parties like defendants Berrigan, Dangerfield, Sankar or Guritzky.

Plaintiff's Employment Agreement states that it "shall terminate immediately upon Physician's death, retirement, **resignation**, or dismissal." <u>See</u> Exhibit A, Section VI.A (emphasis added). Therefore, the Employment Agreement and its arbitration provision terminated on January 26, 2007, when Dr. Soliman resigned her faculty position. The arbitration provision was not applicable on or after January 26, 2007, during which time defendants resumed their retaliation against her. <u>See</u> Am. Compl. at ¶¶ 105, 111.

    **B.**    <u>**Defendants' Discrimination and Retaliation Against Dr. Soliman.**</u>

Beginning in 2000, Dr. Soliman became the victim of a campaign of gender

discrimination and retaliation by defendants, including defendants MFA, Berrigan, Dangerfield, Sankar and Guritzky, through discriminatory scheduling, advancement, wages and lab assignments.  As set forth below, these discriminatory and retaliatory acts do <u>not</u> arise under the scope of Dr. Soliman's Employment Agreement with MFA, as they do not implicate plaintiff's obligation to work for defendant MFA in exchange for compensation and benefits provided by defendant MFA, <u>see</u> Exhibit A, Sections III, IV and VII, or plaintiff's obligation not to compete with defendant MFA after the termination of the contract.  <u>Id.</u>, Section VIII.

**1.     <u>Defendants' Discriminatory Evaluations of Dr. Soliman.</u>**

After enduring nearly five years of a sexually hostile work environment, Dr. Soliman retained counsel and reported this discrimination to defendants GWU's and MFA's in-house counsels.  <u>See</u> Am. Compl. ¶ 52.  Instead, defendants' abuse and retaliation then escalated.  <u>Id.</u> at ¶ 53.  On February 6, 2006, Dr. Soliman again approached defendant GWU's counsel and reported that, among other things, Dr. Berrigan, in his capacity as GWU Department Chairman, had given her an inaccurate and discriminatory performance evaluation.  <u>Id.</u> at ¶ 66.  However, Defendants GWU and Berrigan did nothing to correct or stop their ongoing discrimination and retaliation against Dr. Soliman, despite her renewed complaints.  Indeed, only several months later, defendants GWU and Berrigan again gave her another inaccurate and discriminatory performance evaluation, even though she had discussed her annual report with Dr. Berrigan. This time, her signature had been removed from the evaluation she had reviewed and signed, and had been attached to a blank report, which reflected poorly on Dr. Soliman and was plainly false. <u>Id.</u> at ¶¶ 71-73.

Since Dr. Soliman's Employment Agreement does not call upon the MFA to evaluate her performance (which is instead covered by the GWU Hospital Bylaws), her claims based upon the

discriminatory and retaliatory performance evaluations do not arise under the Employment Agreement.

      **2.**      **<u>Defendants GWU and Berrigan's Discrimination in Making Appointments.</u>**

Defendant Berrigan, in his capacity as Chairman of the GWU Department of Anesthesiology and Critical Care Medicine, gave prominent administrative positions to far less qualified male doctors, including Dr. Guritzky, who at the time was not board certified because he had repeatedly failed the anesthesia board exam. <u>See</u> Am. Compl. at ¶¶ 40, 42-43. As a result of GWU's and Dr. Berrigan's actions, these male doctors, including Dr. Guritzky, received higher compensation than did Dr. Soliman.

Although Dr. Soliman's compensation is covered by her Employment Agreement, the discriminatory event that caused her to receive lower compensation than similarly (or less-) qualified male physicians resulted from appointments made by GWU and by Dr. Berrigan in his capacity as department chairman, not by any decision made pursuant to Dr. Soliman's Employment Agreement. Moreover, Dr. Soliman's Employment Agreement does not cover academic or administrative appointments, which are the responsibility of GWU, since the only "title" that Dr. Soliman acquired as a result of entering into the Employment Agreement was that of a "Physician" with the MFA. <u>See</u> Exhibit A, Section 1.A (identifying Dr. Soliman as "Physician"). Hence, her claims based on this discrimination in making appointments do not arise under the Employment Agreement.

      **3.**      **<u>Defendants' False Statements to Plaintiff's Prospective Employers.</u>**

In August, 2006, Dr. Soliman applied for a position at Holy Cross Hospital in Maryland. Upon information and belief, defendants Berrigan and Dangerfield, in their capacity as GWU faculty members, deliberately and maliciously made false and inaccurate statements to this

potential employer, which then denied Dr. Soliman the position.  See Am. Compl. at ¶ 75.

      In October 2006, Dr. Soliman applied for a position at the New England Medical Center.
Id. at ¶ 95.  Upon information and belief, Defendants sent a negative evaluation of Dr. Soliman
to the New England Medical Center, which caused that entity to reject her application.  Id. (Dr.
Soliman does not know which of the defendants made this communication, and discovery is
required).  In December 2006, Dr. Soliman sought a license in Massachusetts, but Dr. Silva, the
GWU Hospital Medical Director, sent a negative evaluation to the Massachusetts licensing
authorities, which caused Dr. Soliman to forego seeking a license in Massachusetts.  Id. at ¶ 96.

      However, Dr. Soliman's Employment Agreement does not contain any provision
governing the references that MFA is to provide to other institutions.  While the Employment
Agreement has a non-disparagement provision, that provision only prevents Dr. Soliman from
making "derogatory" comments about MFA, and does not prevent MFA from making derogatory
comments about Dr. Soliman.  See Exhibit A, Section VIII.C (unilateral non-disparagement
clause binding only on Dr. Soliman).  Hence, Dr. Soliman's claims arising from defendants'
false statements to Holy Cross and the Massachusetts licensing authorities do not arise under her
Employment Agreement with MFA.

      **4.**        **Defendants' Suspension of Dr. Soliman's Medical Privileges.**

      On September 4, 2006, Dr. Soliman was the attending anesthesiologist for a surgery on
an obese patient, who subsequently went into cardiac arrest and died.  See Am. Compl. at ¶ 76.
The patient's surgery was successful despite the staff's difficulty in establishing reliable blood
pressure measurements.  Id.  The patient died after leaving the operating room and after she was
no longer under Dr. Soliman's care.  Id.

      The Bylaws of defendant GWU govern Dr. Soliman's clinical privileges and the ability

of GWU to suspend, revoke, or otherwise modify her clinical privileges in response to allegations that she did not provide proper patient care. <u>Id.</u> at ¶¶ 79-81. If defendant GWU wanted to revoke or suspend her clinical privileges, then it had to do so pursuant to the Bylaws. <u>Id.</u> However, Dr. Berrigan, in his capacity as GWU Department Chairman, and Dr. Guritzky, made a false report about Dr. Soliman's care of this patient. <u>Id.</u> at ¶ 77. As a result of this false report, Dr. Silva, in his capacity as Medical Director of the GWU Hospital, suspended Dr. Soliman's clinical privileges. <u>Id.</u> at ¶ 78. However, this action was in violation of their own Bylaws and in an effort to drive Dr. Soliman out of her job, because defendant GWU, UHSDC and DHP did not provide Dr. Soliman with a formal recorded hearing, the right to a legal advisor, the right to formally testify on her own behalf, or the opportunity to present witnesses and documentary evidence to defend herself against defendants' summary suspension of her privileges. <u>Id.</u> at ¶¶ 79-84.

In September 2006, defendants reinstated Dr. Soliman's privileges but conditioned the reinstatement on an "internal confidential peer review" of her charts, which is also not authorized under GWU's Bylaws. Am. Compl. at ¶ 86. This monitoring also had the effect of further denying Dr. Soliman the due process protections she was entitled to under the Bylaws, because the Bylaws did not contemplate such a punishment, and therefore did not provide for an opportunity to appeal the decision. <u>Id.</u> at ¶ 88.

Defendants then appointed defendant Guritzky, in his capacity as Assistant Professor of Anesthesiology, to conduct the "internal confidential peer review." <u>Id.</u> at ¶ 93. Defendant Guritzky, as Dr. Soliman had previously reported to defendants' counsel, had repeatedly discriminated and retaliated against her; indeed, defendant Guritzky, along with defendant Berrigan, made the false report about Dr. Soliman that led to the summary suspension and

conditional reinstatement.  Dr. Soliman protested Dr. Guritzky's role in the peer review,

knowing his review would be biased.  Id. at ¶ 94.  Defendants refused to remove defendant

Guritzky, and he submitted a biased and false report of Dr. Soliman's patient care.  Id.

     The foregoing suspension of Dr. Soliman's clinical privileges, and the subsequent review

and monitoring, are governed solely by the GWU Bylaws, and not by her Employment

Agreement, which does not have any provisions describing the procedures for suspending or

investigating a physician's clinical privileges.

     **5.**    **Defendants' False Reports to the National Practitioner Databank.**

     On January 26, 2007, Dr. Soliman resigned her faculty position at GWU and took a

position with Virginia Commonwealth University ("VCU").  After Dr. Soliman resigned,

defendants falsely and maliciously notified the National Practitioner Databank ("NPDB") that

she had resigned her privileges "while under investigation."  See Am. Compl. at ¶ 105.  In fact,

she had not resigned her privileges; instead, she became ineligible for them through resigning

from her faculty position.  Id. at ¶ 106.  Defendants' false report to the NPDB not only greatly

harmed Dr. Soliman's professional reputation, but also precluded her from starting her work at

VCU until May 14, 2007, and even then she could only get temporary privileges for six months.

Id. at ¶¶ 108-109.

     As discussed previously, Dr. Soliman's Employment Agreement contains no provision

governing any statements or references made by anybody about Dr. Soliman.  Instead, the non-

disparagement provision is binding solely on Dr. Soliman (i.e., she cannot disparage MFA), but

does not bar anybody from making derogatory statements about her.  Hence, Dr. Soliman's

claims that defendants made false reports about her to the NPDB do not arise under the scope of

the Employment Agreement.

6.     **Defendants' 2007 Peer Review of Dr. Soliman.**

In February 2007, defendants, through the GWU Medical Staff Peer Review Committee, pursued a further unwarranted peer review of Dr. Soliman as part of their continued retaliation against her, even though there was no procedural basis for such review.  <u>See</u> Am. Compl. at ¶ 111.  This subsequent report contained the same falsehoods as did defendant Guritzky's report.  <u>Id.</u> at ¶¶ 112-114.  Dr. Fazy Estafanous, Chairman of the Division of Anesthesiology, Critical Care Medicine & Comprehensive Pain Management at the Cleveland Clinic, also reviewed the cases at Dr. Soliman's request, and reported to defendants that defendants' reports were false and biased.  <u>Id.</u>  Dr. Estafanous found that Dr. Soliman had safely managed the cases, and that she had at no time jeopardized any patient.  <u>Id.</u> at ¶ 114.

Since Dr. Soliman's Employment Agreement contained no provision governing the establishment or the operation of the Medical Staff Peer Review Committee – which are instead governed by the GWU Bylaws – her claims based on the improper peer review in 2007 do not arise under the Employment Agreement.

II.     **STANDARD OF REVIEW.**

Although defendants have labeled their motion a "Motion… to Dismiss *and* Compel Arbitration," their Memorandum in Support only addresses their arguments that this Court should compel arbitration, and does not argue that she has failed to state a claim.

Section 4 of the Federal Arbitration Act ("FAA") grants federal courts the authority to compel arbitration only where a valid and enforceable arbitration agreement exists:  "A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court ... for an order directing that such arbitration proceed in the manner provided for in such agreement."  9 U.S.C. § 4.

9

Parties, however, cannot be forced to arbitrate without an agreement to do so, and the "authority of arbitrators to resolve disputes arises out of an agreement between the parties to engage in arbitration." Invista North America, S.à.r.l. v. Rhodia Polyamide Intermediates S.A.S., 503 F. Supp. 2d 195, 200 (D.D.C. 2007) (citing AT&T Techs. Inc. v. Commc'ns Workers of America, 475 U.S. 643, 650 (1986)); Stromberg Sheet Metal Works, Inc. v. Washington Gas Energy Systems, Inc., 448 F. Supp. 2d 64, 67 (D.D.C. 2006). Thus, "[b]ecause arbitration provisions are in essence a matter of contract between the parties, it is for the courts to decide whether the parties are bound by a given arbitration clause." Stromberg, 448 F. Supp. 2d at 67 (citing Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 84 (2002)).

When a party moves the court to compel arbitration, the court must make a two-part inquiry. Stromberg, 448 F. Supp. 2d at 68. First, the court must determine "whether the parties entered into a valid and enforceable arbitration agreement." Id. Second, the court must then determine whether the claims raised in the complaint are within the scope of that agreement, since an arbitration agreement does not necessarily encompass all claims between its signatories. Id. The party opposing arbitration must show that the arbitration clause cannot be interpreted to cover the claims raised in the complaint. See AT&T Techs. Inc., 475 U.S. at 650.

## III.    LEGAL ARGUMENT.

### A.    Defendants' Motion to Compel Arbitration Fails as to Plaintiff's Claims Arising After January 25, 2007.

This Court must find that the arbitration provision in Dr. Soliman's Employment Agreement does not apply as to her claims arising after January 25, 2007, because the entire Employment Agreement terminated upon her resignation on January 26, 2007.

Plaintiff's Employment Agreement with defendant MFA states that the Agreement "shall terminate immediately upon Physician's death, retirement, **resignation**, or dismissal." Exhibit

A, Section VI.A (emphasis added).  On January 26, 2007, Dr. Soliman "resign[ed] as a faculty

member."  Am. Compl. ¶ 104.  Therefore, Dr. Soliman and defendant MFA were <u>not</u> parties to a

valid arbitration agreement after January 25, 2007, when defendants pursued a further

unsupported peer review of Dr. Soliman, based on fabricated charges of poor patient care, in

violation of the bylaws.  Am. Compl. at ¶ 111.  Defendants also subsequently reported Dr.

Soliman to the NPDB, based on their falsified charges and <u>ad</u> <u>hoc</u> investigative procedures.  <u>Id.</u>

at ¶ 105.

This Court should therefore not compel plaintiff to arbitrate claims arising out of any

actions defendants took after January 25, 2007, since any arbitrator will lack jurisdiction under

the Federal Arbitration Act and plaintiff's Employment Agreement to adjudicate those post-

resignation claims.

**B.    Defendants' Motion to Compel Arbitration Fails Because Plaintiff's Claims Do Not Arise Under Her Employment Agreement.**

Even for the period during which Dr. Soliman and defendant MFA were arguably parties

to a valid arbitration agreement,[1] under the second prong of the <u>Stromberg</u> inquiry, the claims

raised in her Amended Complaint are plainly <u>not</u> within the scope of that arbitration agreement.

<u>Stromberg</u>, 448 F. Supp. 2d at 68.  As set forth below, the arbitration clause <u>cannot</u> be interpreted

to cover the claims raised in the Amended Complaint.  <u>See</u> <u>AT&T Techs. Inc.</u>, 475 U.S. at 650.

There is no published case law from this circuit analyzing whether claims like plaintiff's

must be arbitrated under a limited agreement compelling arbitration only of "claims arising

under" an agreement.  <u>See</u> Exhibit A, Section XI.  However, Judge Sullivan of this Court, in an

unpublished opinion, <u>Dowley</u>, opined that:

---

[1]  Plaintiff does not concede, and indeed vigorously contests, that she <u>ever</u> entered into an arbitration agreement with defendants Berrigan, Dangerfield, Sankar and Guritzky.  <u>See</u> Section III.C, <u>infra</u>.

> [T]he language 'arising under' is more restrictive then 'arising out of,' for 'arising under' may denote disputes limited to the interpretation and performance of the contract itself. However, 'arising out of' reaches all disputes having their origin in the contract, whether or not they implicate interpretation or performance of the contract per se. Therefore, if 'arising under' constitutes a broad arbitration clause, 'arising out of' constitutes even a broader arbitration clause that covers all claims that are germane to the subject matter of the contract."

Dowley v. Dewey Ballantine, LLP, Civil Action No. 05-622, 2006 WL 1102768, at *9 (D.D.C. Apr. 26, 2006).

"Arising under" has also been interpreted narrowly by courts in other circuits. The Second and Ninth Circuits have held that "arising under" denotes a dispute limited to the interpretation and performance of the contract itself. The Ninth Circuit interpreted "'arising hereunder' as synonymous with 'arising under the Agreement,'" and noted that the phrase "arising under" has been called "'relatively narrow as arbitration clauses go.'" Mediterranean Enterprises, Inc. v. Ssangyong Corp., 708 F.2d 1458, 1464 (9th Cir. 1983) (quoting Sinva, Inc. v. Merrill, Lynch, Pierce, Fenner & Smith, Inc., 253 F. Supp. 359, 364 (S.D.N.Y. 1966)). Similarly, the Second Circuit held that an arbitration clause referring to "disputes or controversies 'under' or 'arising out of' the contract," limited arbitration to "disputes and controversies relating to the interpretation of the contract and matters of performance." In re Kinoshita & Co., 287 F.2d 951, 953 (2d Cir. 1961); but see S.A. Mineracao da Trindade-Samitri v. Utah Int'l, Inc., 745 F.2d 190, 194 (2d Cir. 1984); see also Michele Amoruso e Figli v. Fisheries Development Corp., 499 F. Supp. 1074, 1080 (S.D.N.Y. 1980) (holding that arbitration clause was limited to differences or disputes arising out of the agreement because, notably, it omitted reference to disputes "relating to" the agreement).

It is notable, therefore, that the cases defendants rely on for the proposition that "broad" arbitration provisions will encompass claims like plaintiff's, actually analyzed different and

substantially broader arbitration provisions than the one in this case.  In <u>Mitsubishi Motors</u>, for example, the arbitration agreement at issue stated:  "All disputes, controversies or differences which may arise between [Mitsubishi] and [Soler] out of or in relation to Articles I-B through V of this Agreement or for the breach thereof, shall be finally settled by arbitration…"  <u>Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.</u>, 473 U.S. 614, 617 (1985).  In <u>Tio</u>, the agreement also contained much broader language:  "[a]ny controversy, dispute or disagreement arising out of or relating to this Agreement, or the breach thereof, shall be settled by binding arbitration."  <u>Tio v. Washington Hospital Center, Inc.</u>, Civil Action No. 04-0701(RMU), 2004 WL 2663149, at *1 (D.D.C. Nov. 5, 2004).  Similarly, in <u>Benefits Communication</u>, the agreement contained much broader language:  "[The declarant] agree[s] to arbitrate any dispute, claim or controversy that may arise between me and my firm, or a customer, or any other person, that is required to be arbitrated under the rules, constitutions, or by-laws of the organizations with which I register, as indicated in item 10 as may be amended from time to time."  <u>Benefits Communication Corp. v. Klieforth</u>, 642 A.2d 1299, 1300 n.4 (D.C. 1994).

Here, in contrast, the arbitration agreement between Dr. Soliman and defendant MFA is more limited, and unambiguously states that the arbitration clause is only applicable to disputes arising out of plaintiff's Employment Agreement: "The parties agree that all claims **arising under this Agreement** shall be resolved through binding arbitration…"  <u>See</u> Exhibit A, Section XI (emphasis added).

Pursuant to the Employment Agreement, Dr. Soliman agreed "to devote [her] professional best efforts and full-time professional effort to the benefit of MFA," and "[i]n return for performing all duties referred to in this Agreement, Physician shall be paid by MFA…" and "shall receive benefits from MFA…"  <u>See</u> Exhibit A, Sections III, IV and VII.  Dr. Soliman's

sole additional obligation under the Agreement was to pledge not to compete with defendant MFA following the termination of the contract.  Id., Section VIII.

Notably, the Employment Agreement, like all faculty practice group agreements, serves only as a mechanism to pay physicians for their clinical work, and does not serve to set forth rules or regulations governing their work.  In fact, the procedures that Dr. Soliman contends were violated so as to give rise to many of her claims in this case were the GWU Hospital Bylaws, which were created and ratified by defendants GWU, UHSDC and DHP and their officers, and not by defendant MFA.  See Am. Compl. ¶ 79.

Defendants' discrimination and retaliation against Dr. Soliman, and their interference with her business relationships, plainly did not "aris[e] under" the Employment Agreement, because these claims are unrelated to (1) whether plaintiff fulfilled her obligation under the Employment Agreement to work for and agree not to compete with defendant MFA; and (2) whether defendant MFA compensated plaintiff accordingly.

The only claim that has even a tangential relationship to the Employment Agreement is Dr. Soliman's claim that defendants promoted male doctors to administrative positions in a discriminatory manner, who then received higher compensation than she did.  But even this claim does not "aris[e] under" the Employment Agreement, because the defendants and agents of defendants who made these discriminatory promotions were acting in their academic capacities, not as officials of MFA and not pursuant to the Employment Agreement.  Additionally, the fact that these male doctors were paid more as a result of these administrative positions is peripheral to the discrimination claim itself.

This Court should therefore deny defendants' Motion to Compel Arbitration, and allow plaintiff's claims to proceed in this forum.

14

**C.    Defendants Berrigan, Dangerfield, Sankar and Guritzky Lack Standing to Compel Arbitration of Plaintiffs' Claims Against Them.**

This Court should deny defendants Berrigan, Dangerfield, Sankar and Guritzky's Motion to Compel Arbitration, because Dr. Soliman did not enter into an arbitration agreement with these defendants.  Even if this Court were to find that Dr. Soliman did enter into an arbitration agreement with these defendants, their discrimination and retaliation against her, and their interference with her business relationships, plainly did not "aris[e] under" the Employment Agreement.  Instead, it arose out of other relationships between defendants in their roles as officials of defendant GWU and George Washington University Hospital.  In other words, the narrowly-defined contractual relationship between defendant MFA and Dr. Soliman in no way concerns or defines her relationship with defendants Berrigan, Dangerfield, Sankar or Guritzky.

**1.    Defendants Berrigan, Dangerfield, Sankar and Guritzky Were Not Signatories to the Arbitration Provision.**

Defendants Berrigan, Dangerfield, Sankar and Guritzky lack standing to compel arbitration here because these defendants were not signatories to plaintiff's Employment Agreement, which contains the arbitration provision at issue here.  "[A] party cannot be required to submit to arbitration any dispute which he has not agreed to so submit." AT&T Techs. Inc., 475 U.S. at 648; Volt Info. Sciences v. Leland Stanford Jr. Univ., 489 U.S. 468, 478 (1989) (the FAA does not require arbitration when the parties have not agreed to arbitrate); EEOC v. Waffle House, Inc., 534 U.S. 279, 294 (2002); Stromberg, 448 F. Supp. 2d at 67.  Thus, "a party seeking to substitute an arbitral forum for a judicial forum must show, at a bare minimum, that the protagonists have agreed to arbitrate some claims."  McCarthy v. Azure, 22 F.3d 351, 355 (1st Cir. 1994).

Here, Dr. Soliman's Employment Agreement, which defendants claim contains an

arbitration agreement between plaintiff and defendants Berrigan, Dangerfield, Sankar and Guritzky, plainly states that it "is an Agreement **between the George Washington University Medical Faculty Associates ("MFA") and the individual ("Physician") who has signed below**." <u>See</u> Exhibit A, Section I ("Scope and Term of Agreement") (emphasis added). Defendants Berrigan, Dangerfield, Sankar and Guritzky did not sign this Employment Agreement, and nowhere does the Agreement mention defendants Berrigan, Dangerfield, Sankar or Guritzky, let alone state that its arbitration provision binds Dr. Soliman to arbitrate disputes with third parties.

> **2.    The Narrow Exceptions to the Rule That Non-Signatories Cannot Enforce an Arbitration Contract Are Not Applicable Here.**

Assuming, arguendo, that plaintiff's claims "aris[e] under" the Employment Agreement, there are three limited circumstances in which non-signatory defendants Berrigan, Dangerfield, Sankar or Guritzky could compel plaintiff to arbitrate her claims against them. This Court should find that none of these circumstances is applicable here.

> **(A)    Equitable Estoppel Does not Justify Arbitration.**

The first circumstance in which defendants Berrigan, Dangerfield, Sankar or Guritzky could seek to compel plaintiff to arbitrate her claims is under an equitable estoppel theory. <u>See</u> <u>Boyd v. Homes of Legend, Inc.</u>, 981 F. Supp. 1423, 1429-33 (M.D. Ala. 1997), *remanded on jurisdictional grounds*, 188 F.3d 1294 (11th Cir. 1999); <u>MS Dealer Serv. Corp. v. Franklin</u>, 177 F.3d 942, 947 (11th Cir. 1999); <u>Grigson v. Creative Artists Agency, L.L.C.</u>, 210 F.3d 524 (5th Cir. 2000). A non-signatory can compel arbitration under an equitable estoppel theory only when: (1) the signatory plaintiff is relying on the terms of the written agreement to assert her claims against the non-signatory, <u>see</u> <u>MS Dealer</u>, 117 F.3d at 947, or (2) when the signatory plaintiff raises "substantially interdependent and concerted misconduct by both the nonsignatory

and one or more of the signatories to the contract." Boyd, 981 F. Supp. at 1433; see also Hill v.

GE Power Sys., Inc., 282 F.3d 343, 349 (5th Cir. 2002) (noting that "only in rare circumstances"

can non-signatories compel arbitration, and concluding that "the courts must not offer contracts

to arbitrate to parties who failed to negotiate them before trouble arrives. To do so frustrates the

ability of persons to settle their affairs against a predictable backdrop of legal rules—the cardinal

prerequisite to all dispute resolution."); see generally EEOC v. Waffle House, Inc., 534 U.S. 279,

293 (2002) ("The FAA directs courts to place arbitration agreements on equal footing with other

contracts, but it 'does not require parties to arbitrate when they have not agreed to do so.'").[2]

The first equitable estoppel exception is plainly not applicable here. The court in MS

Dealer justified estoppel based on the theory that a signatory to a contract should not be able to

sue a non-signatory under the contract and at the same time deny the applicability of its

arbitration clause. MS Dealer, 117 F.3d at 946-48. Obviously, this is a very different case. Dr.

Soliman's claims are not based on the Employment Agreement, which is even not mentioned in

her Complaint or Amended Complaint. Even if her claims invoked the Employment Agreement,

which they do not, none of its provisions would be applicable to the non-signatory defendants

Berrigan, Dangerfield, Sankar or Guritzky, since they did not sign the agreement. Secondly,

plaintiff's claims against defendant MFA and defendants Berrigan, Dangerfield, Sankar and

Guritzky are not "substantially interdependent and concerted." Boyd, 981 F. Supp. at 1433.

Defendants Berrigan, Dangerfield, Sankar and Guritzky discriminated and retaliated against

plaintiff in their academic capacities, not as officials of MFA and not pursuant to the

Employment Agreement. Therefore, plaintiff has not raised "substantially interdependent and

---

[2] Although the prongs of the equitable estoppel inquiry are theoretically separate, they are typically considered as two parts of the same inquiry. However, the Fifth Circuit has held that satisfying one prong alone may not be sufficient to compel arbitration. See Hill v. GE Power Sys., Inc., 282 F.3d 343, 349 (5th Cir. 2002); cf. Positive Software Solutions, Inc. v. New Century Mortgage Corp., 259 F. Supp. 2d 531, 540 (N.D. Tex. 2003) (compelling arbitration where only the concerted misconduct prong was met).

concerted misconduct" by defendant MFA, a signatory to the arbitration provision, and defendants Berrigan, Dangerfield, Sankar or Guritzky, the non-signatories.  Defendants' argument under the second prong of the equitable estoppel exception therefore also fails.

>    **(B)    Litigating Dr. Soliman's Claims Against the Individual Defendants Will Not Eviscerate Her Employment Agreement with MFA.**

The second exception to the rule that non-signatories cannot enforce an arbitration agreement arises when the relationship between the signatory and the non-signatory defendants is sufficiently close that only by permitting the non-signatory to invoke arbitration may "evisceration of the underlying arbitration agreement between the signatories be avoided." MS Dealer, 117 F.3d at 947.  The second exception is not applicable here either.  The relationship between defendant MFA and defendants Berrigan, Dangerfield, Sankar and Guritzky does not rise to the level recognized in MS Dealer, since enforcement of her claims against the individual defendants does not implicate any of her rights or obligations under the Employment Agreement.  Thus, any determination that this Court may make as to the liability of these four individual defendants will have no effect on the Employment Agreement.

Here, defendants Berrigan, Dangerfield, Sankar and Guritzky discriminated and retaliated against plaintiff in their academic capacities, not as officials of MFA and not pursuant to the Employment Agreement.  Therefore, permitting the claims against these defendants to proceed in this forum will not eviscerate the underlying arbitration provision, even if it were applicable to plaintiff's claims.

>    **(C)    The Individual Defendants Are Not Third Party Beneficiaries.**

The third exception to the rule that non-signatories cannot enforce an arbitration agreement "arises when the parties to a contract together agree, upon formation of their agreement, to confer certain benefits thereunder upon a third party, affording that third party

rights of action against them under the contract." <u>MS Dealer</u>, 117 F.3d at 947.  Dr. Soliman and defendant MFA undisputedly did not agree to confer benefits under the Employment Agreement upon any third party, thereby "affording that third party rights of action against them under the contract." <u>Id.</u> (citing <u>Boyd</u>, <u>supra</u>, 981 F. Supp. at 1432).  Dr. Soliman's Employment Agreement plainly states that it "is an Agreement **between the George Washington University Medical Faculty Associates ("MFA") and the individual ("Physician") who has signed below**."  <u>See</u> Exhibit A, Section I ("Scope and Term of Agreement") (emphasis added). Nowhere does the Employment Agreement mention defendants Berrigan, Dangerfield, Sankar or Guritzky, or state that any of its provisions, let alone its arbitration provision, binds plaintiff to arbitrate disputes with third parties such as these four individual defendants.

*    *    *

This Court should deny defendants Berrigan, Dangerfield, Sankar and Guritzky's Motion to Compel Arbitration, because Dr. Soliman did not enter into an arbitration agreement with these defendants.  Even if this Court were to find that Dr. Soliman did enter into an arbitration agreement with defendants Berrigan, Dangerfield, Sankar and Guritzky, their discrimination and retaliation against her, and their interference with her business relationships, plainly did not "aris[e] under" the employment contract between plaintiff and defendant MFA.  Instead, their conduct arose out of defendants' relationships in their roles as GWU and Hospital officials.  The contractual relationship between defendant MFA and Dr. Soliman in no way concerns or defines Dr. Soliman's relationship with defendants Berrigan, Dangerfield, Sankar or Guritzky. Therefore, this Court should deny defendants Berrigan, Dangerfield, Sankar and Guritzky's Motion to Compel Arbitration, and allow plaintiff's claims to proceed in this forum.

IV.     <u>**CONCLUSION.**</u>

For the reasons stated above, Plaintiff respectfully requests that this Court deny the motion to compel arbitration filed by defendants MFA, Berrigan, Dangerfield, Sankar and Guritzky, because plaintiff's claims do not arise under her Employment Agreement, and she never agreed to arbitrate her claims against these individual defendants.

Respectfully submitted,

/s/ Lynne Bernabei

_____
Lynne Bernabei, Esquire (D.C. Bar # 938936)
David Wachtel, Esquire (D.C. Bar # 427890)
Emily Read, Esquire (D.C. Bar # 492773)
Bernabei & Wachtel, PLLC
1775 T Street, N.W.
Washington, D.C. 20009
(202) 745-1942
(202) 745-2627 fax
Attorneys for Dr. Dina Soliman

DATED:  August 22, 2008

# EXHIBIT A

## GEORGE WASHINGTON UNIVERSITY
## MEDICAL FACULTY ASSOCIATES

### PHYSICIAN AGREEMENT

I.   Scope and Term of Agreement.

    A.   This is an Agreement between the George Washington University Medical Faculty Associates ("**MFA**") and the individual ("**Physician**") who has signed below.

    B.   The term of this Agreement shall commence on July 1, 2000, and remain in effect for a period of one (1) year, and thereafter shall renew for successive one-year periods, unless terminated earlier in accordance with this Agreement.

    C.   As a condition of employment hereunder, Physician must be: (i) licensed in the appropriate jurisdiction; (ii) have medical staff membership and clinical privileges and be credentialed at institutions necessary to fulfill the Physician's duties hereunder; and (iii) be credentialed by major MFA managed care plans, as such plans are identified by MFA.

    D.   Notwithstanding the foregoing, for Physicians entering into this Agreement to be effective July 1, 2000, this Agreement shall not take effect unless and until such time as the MFA and The George Washington University ("**University**") have executed an effective Affiliation Agreement.

II.  Relationship to Other Documents.   In fulfilling his/her duties hereunder, Physician shall comply with and be subject to the following:

    A.   The provisions of this Agreement, as such may be amended upon mutual agreement of the parties;

    B.   The initial annual draw to be paid to Physician as set forth in Exhibit A;

    C.   The MFA Compensation Plan (the "**Compensation Plan**") attached hereto as Exhibit B, as such Compensation Plan may be amended by MFA in its discretion;

    D.   The MFA Bylaws and the policies, rules and regulations of MFA, as such Bylaws and policies may be developed and/or amended by MFA in its discretion;

    E.   Medical staff bylaws, rules and regulations of the medical staff of any hospital at which the Physician has privileges, as such medical staff bylaws may be amended by the hospital(s) in their discretion;

    F.   The applicable provisions of the University Faculty Code and Faculty Handbook as set forth in the Physician's academic appointment letter and other rules and regulations of the University, as such Code, Handbook, rules and regulations may be amended by the University in its discretion; and

    G.   Applicable local and federal law.

III.  Physician's Obligations. Within the scope of the Physician's licensure, expertise and assigned duties, Physician agrees to devote his/her professional best efforts and full-time professional effort to the benefit of MFA, including, without limitation, the devotion of sufficient time and effort to provide teaching, research and administrative services to the University. Included among these obligations are full compliance with the following:

A.  All MFA, University and applicable hospital policies and guidelines, including timely submission of credentialing documentation, including source documentation to the MFA for managed care credentialing;

B.  All federal, state and local regulatory requirements and Medical Center policies, including, but not limited to, requirements concerning rendering services, billing, compliance, supervision of residents, risk management, service excellence, productivity and documentation generally and documentation of services by teaching physicians;

C.  Timely completion of patient clinical records at any ambulatory or inpatient setting at which the Physician provides services and submission of complete and correct billing information to the MFA;

D.  All MFA, University and applicable hospital practice guidelines (including clinical pathways), policies on timely scheduling of all patients and cancellation of patient appointments, correspondence with referring physicians, compliance with MFA utilization targets and strategic planning, and compliance with payor contracts;

E.  Commitment to the best interests of the MFA and the University by fully participating in the resolution of malpractice complaints;

F.  Full commitment to the MFA's patient care and quality improvement programs, including constant efforts to improve patient satisfaction;

H.  Conduct that is consistent with the ethical standards of the MFA and University;

I.  As appropriate to Physician's specialty, maintenance of membership and appropriate clinical privileges at such hospitals as is consistent with Physician's site of service;

J.  Physician's maintenance of a full-time, regular active status faculty appointment from the University; and

K.  Abide by the terms of the Academic Affiliation Agreement between the MFA and University, as agreed to by the MFA.

IV.  Physician Compensation.

A.  In return for performing all duties referred to in this Agreement, Physician shall be paid by MFA the initial annual draw set forth in Exhibit A and otherwise in accordance with the MFA Compensation Plan set forth in Exhibit B.

B.  In accordance with MFA policy, Physician may not engage in any regular medical/clinical activity of a remunerative nature outside his/her employment with MFA without the prior written approval of the MFA CEO or President. The only exceptions to this rule are for: (1) management of personal investments; and (2) occasional honoraria approved by the MFA Clinical Director for the MFA Clinical Department or division to which Physician is assigned.

Physician shall report annually to his/her Clinical Director all professional or other relevant activities, whether paid or unpaid, so those issues of conflict of interest can be addressed under applicable policies.

V. **Professional Fees**.

    A.    Professional fee levels will be recommended by the MFA Clinical Department responsible for the Physician's professional services. However, an effort will be made through established interdepartmental processes to rationalize fee levels across MFA Clinical Departments. MFA will, if necessary, adjust fee levels to ensure that similar procedures performed in a department or in different departments have appropriate fees and that the fee schedule for a particular department or services does not adversely affect the utilization of resources or the competitiveness of MFA as a multi-specialty group seeking to obtain service contracts and to serve the public.

    B.    MFA may, from time to time, enter into or approve contracts for the provision of services by MFA physicians, including managed care agreements and the payment terms from third party payors. Physician agrees to provide care under, be bound by and comply with all terms of such contracts. Physician may not contract independently with a health maintenance organization or other payor for clinical patient care services.

    C.    All patient care professional fees generated by the Physician shall be billed through the MFA. Physician agrees not to charge, bill for, or receive remuneration for clinical services other than as provided in this Agreement, and to turn over to MFA any remuneration received for such services. Physician must conduct all professional medical services under the auspices of MFA and assign all professional fees to MFA.

    D.    Physician may provide scheduled patient care services at institutions or sites other than those serviced by the MFA only after approval by the appropriate Clinical Director and MFA's Chief Executive Officer, and the required site statement for professional liability coverage has been filed by the Physician and approved.

    E.    The MFA Business Office will report periodically to each Clinical Department on the financial performance of the Clinical Department, its divisions and its individual Physicians.

VI. **Interruption or Termination of Service**.

    A.    This Agreement shall terminate immediately upon Physician's death, retirement, resignation, or dismissal. In accordance with MFA policies, upon such events, Physician's compensation shall be as set forth in the MFA Compensation Plan. In the case of resignation, Physician must provide at least one hundred twenty (120) days advance written notice to MFA in order to be eligible for any incentive compensation under the MFA Compensation Plan.

    B.    If Physician's full time work is interrupted due to disability, the Physician shall be entitled to such compensation as set forth in the MFA Compensation Plan and such benefits as are provided in the applicable MFA policies on disability.

    C.    Despite interruption of the Physician's work or termination of this Agreement for any reason, MFA is entitled to all accounts receivable, professional fees, and other income of the Physician hereunder relating to the periods prior to such event. The Physician acknowledges the right of MFA to receive payment and negotiate checks or other documents in order to obtain payment for services rendered by Physician under this Agreement.

D.    For Physicians with non-tenured faculty appointments at the University, MFA may elect not to renew this Agreement without cause as of the end of any annual term upon giving Physician the following minimum period of notice (as applicable):

      1.    Not later than March 1 of the first year of service in the case of a Physician during his/her first year of employment;

      2.    Not later than December 1 of the second year of service; and

      3.    Not later than June 30 preceding the next annual term, after the second or subsequent years of service.

   For all of the above periods, years of service with the MFA shall be deemed to include prior faculty employment with the University.

E.    MFA may terminate this Agreement, effective immediately, for cause, which shall include:

      1.    termination, suspension or other limitation of membership on the Medical Staff or clinical privileges of a hospital at which Physician has privileges, for reasons related to professional conduct (as opposed to a voluntary relinquishment of such membership or privileges unrelated to a review of professional conduct);

      2.    loss or suspension of Physician's license to practice medicine in any jurisdiction material to Physician's performance under this Agreement;

      3.    conviction of or sentencing for a felony or, in the case of a misdemeanor, a misdemeanor that involves moral turpitude or other conduct that the MFA could reasonably expect to have an adverse impact on the business or reputation of the MFA or the University;

      4.    termination by the University of Physician's appointment to the faculty of the University;

      5.    exclusion of Physician from participation in the Medicare or Medicaid Programs; or

      6.    Physician's gross inattention or willful neglect of his/her duties hereunder.

F.    For Physicians with non-tenured faculty appointments to the University: Physician agrees that termination of this Agreement for any reason shall result in the simultaneous, automatic termination of Physician's appointment to the faculty of the University. Upon termination of this Agreement, MFA may notify the University of such termination and its effective date.

VII.    Physician Benefits. In addition to MFA Income set forth in Article IV, Physician shall receive benefits from MFA as follows:

A.    Professional Expense Account. In accordance with MFA's policies, each MFA Clinical Department may budget an amount of money to be used for approved categories of professional expenses for physicians assigned to such departments and incurred in the advancement of their expertise and ability to serve the MFA or University. The Clinical Director of the respective department, in his/her discretion, shall allocate these monies to physicians in his/her department in the faculty in a manner consistent with MFA's obligations hereunder and relevant MFA policies; provided, however, that the total amount expended by the department shall not exceed the actual amount budgeted and received by the Clinical Director.

B.  <u>Professional Liability Coverage</u>. MFA shall maintain an insurance plan covering Physician, a description of which is available upon request.

C.  <u>Other Fringe Benefits</u>. Physician is eligible for a retirement program, disability benefit plan, health insurance plan, and group life insurance as described in MFA policy, and subject to the conditions and limitations of such plans. Retirement program and disability plan benefits based upon income shall be calculated on the basis of income received from MFA.

VIII.  <u>Professional Conduct</u>.

A.  Physician agrees that in consideration for the compensation paid, and the benefits provided to Physician, and the costs incurred by MFA hereunder, for a period of one (1) year following expiration or termination of this Agreement for any reason, Physician shall not maintain an office or provide (except in an emergency or other exceptional and non-recurring circumstances) medical or hospital services, at any location within a radius of five miles of The George Washington University Hospital ("**Hospital**"), the Ambulatory Care Center and any practice location at which Physician has been primarily assigned in the two years preceding expiration or termination of this Agreement, without the prior written consent of the MFA, which consent may be granted or withheld in its discretion. Notwithstanding the foregoing, this Section VIII.A. shall not apply to any MFA Physician who was a faculty employee of the University prior to March 1, 1997.

B.  During the term of this Agreement and for a period of one year after its expiration and termination for any reason, Physician shall not (i) solicit for employment, induce to leave the MFA, or employ or engage for work, any person employed by the MFA, without the prior written consent of the MFA, which consent may be granted or withheld in the discretion of the MFA; (ii) solicit any MFA patients or send announcements or publications regarding new offices or practice affiliations to MFA patients, except that this provision shall not prohibit Physician from making announcements about such offices or practice arrangements to the general public in newspapers, periodicals, and mass mailings; (iii) remove patient records from MFA other than pursuant to this Agreement; and (iv) take, make, copy, or distribute in any way lists of MFA patients other than pursuant to this Agreement.

C.  During and after the term of this Agreement (and despite its expiration or termination for any reason), Physician shall refrain from making any oral or written comment to any third party that is derogatory concerning the University, Hospital or MFA, its physicians, or its services, and that is reasonably likely to adversely affect the University's, Hospital's or MFA's reputation or business.

D.  The provisions of this Section VIII shall survive expiration or termination of this Agreement.

IX.  <u>Disposition of Records and Cooperation</u>.

A.  All records of patients attended by the Physician are and shall remain the property of MFA or the relevant hospital. Copies of patient records shall be furnished to appropriate parties in the following circumstances:

1.  A written request for the transfer of medical records may be submitted by a former patient and must be accompanied by a signed release from each patient reasonably satisfactory to MFA.

2.  Copies of records may be transferred when otherwise required or authorized by law.

3.  To the University (1) for patients treated by the MFA on or before July 1, 2000; (2) in the event that the University receives a complaint related to patient treated at the MFA; or (3) in the event the University is requested to make payment related to patient care by MFA or is named in a complaint or as a defendant in a lawsuit related to care by MFA.

B.  Physician acknowledges that MFA has a legitimate interest in (1) ensuring continuing care of patients when a physician is temporarily unable to perform his/her duties or terminates this Agreement or is unable to continue in practice; (2) in appropriately billing for and receiving payment for MFA services; (3) in resolving billing disputes; and (4) in defending or resolving legal claims. Accordingly, Physician agrees that despite expiration or termination of this Agreement for whatever reason, he/she will not obstruct MFA's effort to provide continuity of care and he/she shall provide reasonable cooperation to the University and MFA in asserting or defending its rights in matters such as those described above, at no additional expense.

C.  Contract. Physician hereby expressly waives any claims or rights against MFA arising from or relating to Physician's employment, tenure status (if applicable) or other arrangements or understandings with the University. Nothing herein shall be deemed to waive or affect any rights Physician may have arising out of Physician's prior arrangements with the University, including tenure (if applicable).

XI.  Other. This Agreement shall be construed in accordance with the laws of the District of Columbia, without regard to any choice of law provisions thereof. The parties agree that all claims arising under this Agreement shall be resolved through binding arbitration in accordance with the American Health Lawyers Alternative Dispute Resolution Rules of Procedures. Each party shall bear its own costs of arbitration.

MEDICAL FACULTY ASSOCIATES, INC.,
d/b/a GEORGE WASHINGTON UNIVERSITY
MEDICAL FACULTY ASSOCIATES

_____
Alan G. Wasserman, MD
President
Medical Faculty Associates, Inc

PHYSICIAN

_____
(Signature of Physician)

DINA SOLIMAN
(Typed Name of Physician)

June 12 2000
(Date)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                                      )
DINA SOLIMAN, M.D.                          )
                                                      )
              Plaintiff                            )
                                                      )
       v.                                            )        Civil Action No. 1:08-cv-01137 (RJL)
                                                      )
THE GEORGE WASHINGTON             )
UNIVERSITY, *et al.*                           )
                                                      )
              Defendants.                        )
_____)

**ORDER**

Upon consideration of Defendants Medical Faculty Associates, Dr. Berrigan, Dr.

Dangerfield, Dr. Sankar and Dr. Guritzky's Motion to Dismiss and to Compel Arbitration (Aug.

8, 2008), Plaintiff's Opposition thereto (Aug. 22, 2008), any reply, and the entire record of this

case, it is this _____ day of _____, 2008, hereby

**ORDERED** that Defendants' Motion to Dismiss and to Compel Arbitration, shall be and

hereby is **DENIED.**


                                            _____
                                            Honorable Richard J. Leon
                                            United States District Judge