IN THE UNITED STATES DISTRICT COURT FOR
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DINA SOLIMAN,          ) | |
| )| |
| Plaintiff,             ) | |
| ) | |
| v.                     ) | Civil Action No.: 1:08-cv-01137-RJL |
| ) | |
| THE GEORGE WASHINGTON  ) | |
| UNIVERSITY, *et al.*,  ) | |
| ) | |
| Defendants.            ) | |

### THE GEORGE WASHINGTON UNIVERSITY'S REPLY TO SOLIMAN'S OPPOSITION TO THE UNIVERSITY'S MOTION FOR PARTIAL DISMISSAL[1]

Soliman seeks to evade partial dismissal by relying upon the continuing violation doctrine. Her reliance, however, is misplaced. To the contrary, because Soliman complains about discrete alleged discriminatory acts, which she knew about years ago, the doctrine is completely inapposite to this case.

The Court should narrow this case from the outset by dismissing Soliman's Title VII and DCHRA claims against the University to the extent that she premises them upon alleged conduct that purportedly occurred beyond their respective limitations periods.[2]

---

[1] The George Washington University submits this reply in an abundance of caution even though Soliman has filed an amended complaint. The Unversity intends to file a motion for partial dismissal of Soliman's amended complaint.

[2] Soliman concedes that her Title VII claim is time-barred to the extent that she premises it upon her removal from the Heart Team (Cmplt ¶ 19), the rejection of her application for a position on the Heart Team (Cmplt. ¶ 23) Opp. at 10, and the "false rumors" generated about her at that time (Cmplt. ¶ 22). *Id.*

LDR/233138.2

I.   **Argument**

  A.   **Soliman's Title VII Claim against the University is Time-barred to the Extent that she Premises it upon Alleged Conduct that Purportedly Occurred before November 11, 2006.**

The law distinguishes between acts of discriminatory intimidation, ridicule, or insult, to which the continuing violation doctrine might apply, from discrete acts of discrimination or retaliation, to which the doctrine has no bearing. *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002); *Lester v. Natsios*, 290 F. Supp.2d 11, 33 (D.D.C. 2003); *Webb v. District of Columbia*, 864 F. Supp. 175, 183 (D.D.C. 1994).

The danger of blurring that distinction is apparent. Allowing plaintiffs "[t]o conveniently cast all the allegations in this complaint as a related series of discriminatory or retaliatory actions would permit [them] to bypass the Title VII administrative process." *Powell v. Castaneda*, 390 F. Supp.2d 1, 9 (D.D.C. 2005) (quoting *Childers v. Slater*, 44 F. Supp.2d 8, 18 (D.D.C. 1999)). *See Morgan*, 536 U.S. at 112 ("[D]iscrete acts that fall within the statutory time period do not make timely acts that fall outside the time period."); *Brantley v. Kempthorne*, No. Civ. A. 06-1137 (ESH), 2008 WL 2073913, at *8 (D.D.C. May 13, 2008) ("hostile work environment plaintiff may not 'bootstrap' her alleged discrete acts of discrimination and retaliation into a broader hostile work environment claim") (citing *Keeley v. Small*, 391 F. Supp.2d 30, 51 (D.D.C. 2005)); *Patterson v. Johnson*, 391 F. Supp. 2d 140, 146 (D.D.C. 2005) (a plaintiff may not cure the failure to timely complain about certain incidents by stringing them together to create a hostile environment claim).

That is precisely what Soliman attempts to do here. She premises her Title VII claims upon discrete incidents of purported wrongdoing, not a continuous chain of related

acts that extends into Title VII's limitations period. *See* the University's Memorandum of Points and Authorities in Support of its Motion for Partial Dismissal, at 3-4. Thus, the continuing violation doctrine affords her no comfort.

Moreover, "[u]nder the law of this Circuit, the continuing violations doctrine will not toll the statute of limitations where plaintiff is aware of the alleged violations." *Paul v. Judicial Watch, Inc.*, 543 F. Supp. 2d 1, 10 (D.D.C. 2008) (citing *Moore v. Chertoff*, 437 F. Supp. 2d 156, 162-63 (D.D.C. 2006)); *see Butler v. Fairbanks Capital*, Civ. A. 04-0367, 2005 WL 5108537, at * 9 (D.D.C. Jan. 3, 2005).

Soliman neither alleges, nor even remotely suggests, that she was unaware of the University's alleged wrongdoing. Rather, the Complaint makes clear that she knew about it early on. Indeed, alone and through her attorney, she repeatedly complained, about discrimination and retaliation beginning as early as February, 2005. *See, e.g.*, Cmplt. ¶ 52 ("On February 15, 2005, Dr. Soliman's attorney sent a letter to . . . defendant GWU's Associate General Counsel, Mary Lynn Reed, stating that defendants had discriminated and retaliated, against Dr. Soliman by refusing to allow her to work on the Heart Team, paying her less than male colleagues, and creating a hostile work environment."); ¶ 66 ("On February 6, 2006, Dr. Soliman's attorney told defendants GWU and MFA that defendant Berrigan had not evaluated Dr. Soliman fairly because defendant had denied her the opportunity to work with residents. . . . Her attorney's letter stated that the defendants' discriminatory and retaliatory actions had damaged Dr. Soliman's reputation and restricted her future career opportunities."); ¶ 69 ("In May 2006, Dr. Soliman met with Dr. James Scott, Dean of defendant GWU's Medical School, to report the defendant's discriminatory and retaliatory treatment of her."); ¶ 70 ("On May 23, 2006,

Dr. Soliman followed up with Dr. Scott regarding defendants' discriminatory and retaliatory treatment."); ¶ 87 ("In an October 3, 2006 letter to Dr. Silva, Dr. Soliman objected, through counsel, to defendant Guritzky reviewing the cases because she did not believe that defendant Guritzky would conduct an unbiased review as he had discriminated and retaliated against her in the past by making false statements about her, refusing to schedule her to work with residents, and giving her harsh and unfair schedules in the EP lab. Defendants GWU and MFA ignored her complaints about his demonstrated bias against her.").

In short, Soliman's citation to the continuing violation doctrine contributes nothing to her case. Thus, her Title VII claim against the University fails as a matter of law, to the extent that she premises it upon conduct that occurred before November 11, 2006.

    **B.**    **Soliman's DCHRA Claim against the University is Untimely to the Extent that she Premises it Upon Alleged Conduct that Purportedly Occurred before September 6, 2006.**

Soliman's DCHRA claims fares no better, to the extent that she premises it upon alleged conduct that purportedly occurred before September 6, 2006.

The District of Columbia Court of Appeals recently held that DCHRA plaintiffs can toll their claims by filing a charge with the EEOC. *Estenos v. PAHO/WHO Federal Credit Union*, 952 A.2d 878, 885-86 (D.C. 2008). In view of that ruling, Soliman's DCHRA claim against the University is time-barred to the extent that she premises it upon alleged conduct that purportedly occurred before September 6, 2006, one year before she filed her charge. That alleged conduct includes her contention that: (1) Dr. Gertrude Mergner removed her from her position on the Heart Team, Cmplt. ¶ 19; (2) the University reassigned her to work on more difficult emergency and weekend heart cases,

Cmplt. ¶ 20; (3) Dr. Jason Sankar and Dr. Michael Berrigan spread false rumors that she was having affairs with residents and therefore was a threat to residents and fellows, Cmplt. ¶ 22; (4) Dr. Sankar rejected her application for a position on the Heart Team in favor of less-qualified male doctors, Cmplt. ¶ 23; (5) Dr. Paul Dangerfield and Dr. Sankar routinely assigned her to perform electroconvulsive therapy alone and to work alone in the electrophysiology ("EP") lab for long hours without breaks, Cmplt. ¶¶ 24, 36, 37, 55; (6) Dr. Dangerfield and Dr. Sankar rarely scheduled her to teach or work with residents, Cmplt. ¶ 25; (7) Dr. Dangerfield and Dr. Sakar refused to schedule her or denied her the opportunity to work with residents, Cmplt. ¶ 36, 48, 54; (8) Dr. Sankar and Dr. Dangerfield told other physicians that she was incompetent and made false statements about her patient care, Cmplt. ¶¶ 29, 33; (9) Dr. Sankar and Dr. Dangerfield were hostile toward her when they worked together, Cmplt. ¶ 29; (10) Dr. Dangerfield repeatedly questioned her judgment during surgeries, Cmplt. ¶ 34; (11) Dr. Dangerfield disagreed with her about conducting a particular surgery and assigned another anesthesiologist when she refused to proceed with the surgery, Cmplt. ¶ 35; (12) Dr. Berrigan gave less-experienced male colleagues administrative positions that provided higher salaries, Cmplt. ¶¶ 40-43; (13) Dr. Paul Manner criticized her in front of a surgical team , Cmplt. ¶ 47; (14) Dr. Brian McGrath and Dr. Sankar criticized her in front of physicians and hospital staff, Cmplt. ¶ 49; (15) Dr. Dangerfield told her that she had come to work after she had been in a car accident, Cmplt. ¶ 56; (16) Dr. Dangerfield kept her from working with residents and assigned her to work alone on the Pain Service, the obstetrics ward and in the EP lab, Cmplt. ¶ 65; (17) Dr. Berrigan gave her performance evaluations that did not fairly reflect her accomplishments and contributions, Cmplt. ¶ 66; (18) she was given

unequal EP lab assignments that prevented her from spending time with a visiting professor, Cmplt. ¶ 67; (19) Dr. Joshua Katz criticized her work in front of colleagues and spoke with her in a threatening and abusive manner while she was providing post-operative care to a patient, and then Dr. Katz and Dr. Pla stood outside the operating room and criticized her competence, Cmplt. ¶ 68; (20) Dr. Berrigan posted a blank annual report for her which she had not seen or agreed to, and then refused to change the false report before he and the medical school dean discussed and signed it, Cmplt. ¶¶ 72-74; and (21) Dr. Berrigan and Dr. Dangerfield falsely criticized her performance to officials at Holy Cross Hospital, where she had applied for a position, Cmplt. ¶ 75.[3]

Also, because Soliman (1) pins her claim upon discrete discriminatory and retaliatory acts; and (2) knew about the University's alleged violations early on, the continuing violation doctrine upon which she relies does not salvage her claim. *See* pp. 2-4, *supra*.

## II.   Conclusion

For all of the foregoing reasons, and for the reasons set forth in the University's opening brief, the Court should grant the University's Motion for Partial Dismissal and issue an order (1) dismissing Soliman's Title VII claim against the University to the extent that she premises it upon alleged conduct that purportedly occurred before November 11, 2006, and (2) dismissing Soliman's DCHRA claim against the University

---

[3] To the extent that the University relies upon facts alleged in Plaintiff's Complaint, it does so only for the purposes of this Motion and without any admission as to the truth of those alleged facts. Further, the University assumes only for the purposes of this Motion and without prejudice that these allegations, alone and taken together, constitute actionable "adverse actions" that were committed by an agent or employee of the University.

to the extent that she premises it upon alleged conduct that purportedly occurred before September 6, 2006.

        Respectfully submitted,

        ARENT FOX LLP

        By:    /s/ Kristine J. Dunne.
                Henry Morris, Jr. (Bar No. 375894)
                Kristine J. Dunne (Bar No. 471348)
        1050 Connecticut Avenue, N.W.
        Washington, D.C. 20036-5339
        Telephone: (202) 857-6000
        Facsimile: (202) 857-6395
        *Counsel for Defendant The George Washington University*